UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 19-22553-CIV-MORENO/GOODMAN

LAS ORIGINALES PIZZA INC.,
a Florida corporation and
MONTE PIZZA INC., a
Florida corporation,

      Plaintiffs,

v.

BATABANO GROUP, INC.,
a Florida corporation; BATABANO
GROUP II, INC., a Florida corporation;
BATABANO GROUP III, INC.,
a Florida corporation; LUIS PEÑA,
individually; and YAMILIN MEDEROS,
individually,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON PLAINTIFFS'
SUMMARY JUDGMENT MOTION**

      In this trademark-infringement case, Las Originales Pizza Inc. and Monte Pizza

Inc. (collectively, "Plaintiffs") sued Batabano Group, Inc. ("Batabano I"), Batabano Group

II, Inc. ("Batabano II"), Batabano Group III, Inc. ("Batabano III"), Luis Peña ("Peña") and

Yamilin Mederos (collectively, "Defendants"), alleging that Defendants infringed on the

"MONTES DE OCA" and "MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO

VARADERO)" marks (collectively, the "Marks").

Plaintiffs filed a summary judgment motion, Defendants filed an opposition response, and Plaintiffs filed a reply. [ECF Nos. 56; 66; 73]. Plaintiffs also filed a statement of facts and Defendants filed a response to the statement of facts. [ECF Nos. 57; 67].

Senior United States District Judge Federico A. Moreno referred[1] to the Undersigned Plaintiffs' summary judgment motion for a Report and Recommendations. [ECF No. 83]. For the reasons stated below, the Undersigned **respectfully recommends** that the District Court **grant in part** and **deny in part** Plaintiffs' summary judgment motion.

## I.      Background

Plaintiffs allege the following causes of action against all Defendants: false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count II); Florida common law infringement (Count III); Florida common law unfair competition (Count IV); federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 (Count V); and Florida registered mark infringement in violation of Fla. Stat. § 495.131 (Count VI). *See* Amended Complaint

---

[1]      Judge Moreno also referred to the Undersigned the summary judgment motions [ECF Nos. 58; 60; 99] filed by Defendants Batabano I, Luis Peña, and Yamilin Mederos. *See* Referral Orders [ECF Nos. 83; 101]. The Undersigned will address those motions in separate Reports and Recommendations.

[ECF No. 37].

Plaintiffs move for summary judgment on Counts I and III through VI of their Amended Complaint. [ECF No. 56].

## II.    Undisputed Facts[2]

**The Parties**

1.    Las Originales Pizza Inc. ("Las Originales") is a Florida corporation incorporated on December 5, 2017.

2.    Las Originales is owned and operated by Barbara Montes de Oca ("Barbara") and Maria del Pilar Montes de Oca ("Pilar").

3.    Monte Pizza Inc. ("Monte Pizza") is a Florida corporation incorporated on May 9, 2018.

4.    Monte Pizza is owned and operated by Maria Gonzalez ("Gonzalez"), Barbara, and Manuel Montes de Oca Sr. ("Senior" or "Manolo").

---

[2]    The facts are generated from the paragraphs in the statement of facts or response to the statement of facts which the respective opposing party expressly agreed are undisputed. [ECF Nos. 57; 67]. For those purported facts which the opposing party classified as partly disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by the parties. The abbreviation, "N/A," means that the paragraph is disputed. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If a party argued that a fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be undisputed if otherwise supported by record evidence.

5.      Defendant Batabano I is an administratively dissolved Florida corporation that was doing business in this District during the relevant time period.[3]

6.      The public records of the Florida Department of State reflect that Batabano I was incorporated in Florida on June 19, 2009 by Alexis Mederos. However, during his deposition, Alexis Mederos did not recognize the articles of incorporation.[4]

---

[3]      Paragraph 5 of Plaintiffs' statement of material facts alleges that Batabano I "is an administratively dissolved Florida corporation that was doing business in this [D]istrict *when the tortious acts were committed*." [ECF No. 57, ¶ 5 (emphasis added)]. Defendants dispute the portion of this paragraph which asserts that Batabano I committed tortious acts. [ECF No. 67, ¶ 5].

For summary judgment purposes, it is sufficient to state that Batabano I, an administratively dissolved corporation, was doing business in this District during the relevant time period. Whether Batabano I committed tortious acts is factually and legally disputed by the parties.

[4]      The second sentence of paragraph 6 appears as footnote 1 in Plaintiffs' statement of material facts. [ECF No. 57, ¶ 6, n.1]. Defendants dispute this footnote "to the extent it attempts to disprove [Alexis] Mederos incorporated the entity." [ECF No. 67, ¶ 6, n.1 (citing articles of incorporation)]. However, the statement *is* factually correct and not actually factually disputed. Alexis Mederos did not, in fact, recognize the articles of incorporation for Batabano I during this deposition:

Q      Okay. **You are looking at Exhibit 1** right now. I'm going to scroll, slowly scroll to the bottom of the document.

        **Mr. Mederos, do you recognize this document?**

A      **No.**

Q      **I represent to you that these are Articles of Incorporation for Batabano Group, Inc.**

7.      Defendant Batabano II is an administratively dissolved Florida corporation that was doing business in this District during the relevant time period.[5]

8.      The public records of the Florida Department of State reflect that Batabano II was incorporated in Florida on October 3, 2011 by Alexis Mederos.

9.      Defendant Batabano III is an active Florida corporation doing business in this District.

10.     The public records of the Florida Department of State reflect that Batabano III was incorporated in Florida on August 22, 2018, listing Defendant Peña as president and Defendant Yamilin Mederos as vice-president.

---

A      **I don't know.** Manolo [Montes de Oca Sr.] was giving me documents for me to sign and I was signing as a cook. Manolo would bring me papers every time that Manolo came and he would tell me, "sign here," and I would sign and I have no knowledge. He would bring those documents in English. I don't know English. He would have me sign and I would sign.

[ECF No. 57-8, pp. 15:22-16:11 (emphasis added)].

Defendants do not contend that Alexis Mederos' deposition excerpt was inaccurately transcribed or that it was taken out of context. Because the statement in Plaintiffs' footnote -- that "during his deposition, [Alexis] Mederos did not recognize the articles of incorporation" for Batabano Group I -- is factually true, the Undersigned will deem it an undisputed fact for purposes of the instant motion.

[5]      As in the case of paragraph 5, Defendants dispute the portion of paragraph 7 which asserts that Batabano II committed tortious acts. [ECF No. 67, ¶ 7]. For summary judgment purposes, it is sufficient to state that Batabano II, an administratively dissolved corporation, was doing business in this District during the relevant time period. Whether Batabano II committed tortious acts is factually and legally disputed in this case.

11.     Peña is a resident of Miami-Dade County, Florida doing business in this District, in his capacity as an officer of the Batabano defendants.[6]

12.     Peña is the sole shareholder, officer, and director of Batabano I and II and is a majority shareholder,[7] director, and president of Batabano III.

13.     Defendant Yamilin Mederos is a resident of Miami-Dade County, Florida doing business in this District, in her capacity as an officer of Batabano III.

14.     Yamilin Mederos is a shareholder, director, and vice-president of Batabano III.

**The Subject Marks**

15.     On May 9, 2018, Gonzalez formed Monte Pizza in Florida. Monte Pizza has been engaged in the restaurant business since that date.

16.     Monte Pizza owns the rights to the Marks that include the words MONTES

---

[6]     For paragraphs 11 and 13, Defendants insist on adding that Peña and Yamilin Mederos were doing business in their respective capacities as officers of the various Batabano entities. However, "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994). Therefore, whether Peña and Yamilin Mederos were acting in a corporate capacity is immaterial for purposes of determining liability. Nonetheless, the Undersigned includes Defendants' requested language.

[7]     The facts recited in paragraph 12 are undisputed and based on Peña's responses to requests for admissions. The Undersigned merely points out that Peña and Yamilin Mederos are both listed as equal, 50 percent shareholders of Batabano III in a tax return submitted in opposition to Mederos' summary judgment motion. [ECF No. 103-8, pp. 19-20].

DE OCA for restaurant services by having adopted, used, and promoted said Marks directly, or by its predecessor in interest Senior at least as early as 1997.

17.     The Marks include:

a. MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) for restaurant services, which Plaintiffs, through their predecessors in interest, have used in commerce since at least as early as 1997 (and as early as 1989 in a modified form) and is registered with the:

i. U.S. Patent and Trademark Office (registered on June 1, 2021 with Reg. No. 6367178, and filed on December 21, 2018 with Serial No. 88239390) and

ii. State of Florida Secretary of State (registered on July 1, 2019 with Reg. No. T19000000782).

b. MONTES DE OCA for restaurant services, for which Plaintiffs have developed common law rights from their continuous use in commerce since at least as early as 1981.

c. The likeness of Plaintiffs' predecessor in interest Senior, for which Plaintiffs have developed common law rights from their continuous use in commerce since at least as early as 1997.

d. MONTES DE OCA ORIGINAL PIZZA CUBANA for restaurant services, for which Plaintiffs have developed common law rights from their continuous use in commerce since at least as early as 1997.

18.     Plaintiffs have continuously used the Marks in commerce in Florida, thus accruing valuable common law mark rights and goodwill.[8]

---

[8]     Defendants dispute this paragraph by pointing out that "Plaintiffs allowed their state marks MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO), FLA TM Reg. T97000001141; and MONTES DE OCA ORIGINAL PIZZA CUBANA

19.     The Marks are valid, subsisting, and distinctive.

20.     N/A

21.     Monte Pizza granted Las Originales a license to use the Marks.

22.     In 2009, Alexis Mederos executed an agreement -- the As is Purchase and Sale Agreement ("2009 Agreement") [ECF No. 57-6] -- for the purchase of one of the restaurants owned by Senior and Gonzalez. This restaurant was located at 455 Hialeah Drive, Hialeah, Florida.

23.     The 2009 Agreement states, in part, that "[s]o long as the existing lease is in effect, the Buyer shall use the name "Montes de Oca Pizza Cubana" for the Restaurant. The Buyer further agrees to purchase from the Seller the pizza shells and the garlic bread, for the first two years at [certain set prices]." And further states that "[t]he Seller agrees to provide the aforementioned products for the life of the existing lease at a price not to exceed a 30% increase of the aforementioned prices, after the first two years."

24.     The 2009 Agreement states, in part, that: "The parties cannot assign this Agreement or any of their rights under this Agreement except by operation of law to their

---

(ESTILO VARADERO), to lapse in 2007 and 2013, respectively." [ECF No. 67, ¶ 18]. However, Defendants' statement does not dispute the facts alleged in paragraph 18, that Plaintiffs continuously used the Marks in commerce in Florida and, through this continuous use, the Marks have accrued common law mark rights and goodwill. Thus, paragraph 18 is not factually disputed.

personal representatives or heirs in the event of their death, incapacity, or dissolution."[9]

25.     At the time of the 2009 Agreement, Alexis Mederos understood Senior to be the owner of the MONTES DE OCA mark.

**Defendants' Alleged Infringement of the Marks**

26.     N/A[10]

27.     For several years, Batabano I[11] made payments to Senior for food products.

28.     From 2013 through 2016, Peña regularly visited the home of Senior and Gonzalez to personally deliver the payments for the food products (pizza shells and related goods) and discuss business matters involving the restaurants.

29.     In 2016, Senior's health deteriorated, requiring multiple hospitalizations that prevented him from conducting many business activities. He was admitted to a rehabilitation center.

30.     In 2016, Senior delegated some of his business duties to his partner

---

[9]     Defendants do not dispute "that the 2009 [A]greement speaks for itself." [ECF No. 67, ¶ 24]. However, they dispute that this provision remains in effect. *Id.* Because Plaintiffs are simply quoting the language of the agreement, this is not a disputed fact.

[10]    Defendants dispute having received an oral license in 2013 from Senior.

[11]    Plaintiffs state that Peña made the payments. Although Peña *signed* the checks, the copies of the checks attached to Plaintiffs' statement of facts are from Batabano I. Therefore, the Undersigned will modify paragraph 27 to reflect that the payments were from Batabano I.

Gonzalez and two children, Manuel Montes de Oca Jr. ("Junior") and Barbara.[12]

31.    In 2016, Peña visited Senior at the rehabilitation center and they discussed not raising prices for food products sold by Senior to Peña's restaurants that year.

32.    On May 14, 2017, Senior suffered a massive heart attack. As a result, he was in intensive care for approximately one month and a half, during which he was comatose for three weeks. Subsequently, Senior was admitted into a rehabilitation center for about a month and a half and returned home around August 2017. After the heart attack, Senior delegated some of his business tasks to his partner Gonzalez and his daughter Barbara.

33.    In early 2017, Peña and his companies stopped purchasing food products from Senior.

34.    Defendants continued to use the Marks despite no longer purchasing products from Senior.

35.    Defendants continued to use Senior's likeness on restaurant signs, menus, and other material.[13]

---

[12]    Defendants dispute the second sentence of paragraph 30, which states: "[Senior] required that the actions taken were discussed with him first to obtain his approval." [ECF No. 67, ¶ 30]. Defendants cite at least one instance, the 2018 sale of a restaurant to Batabano III, which was done without Senior's approval. *Id.* The Undersigned finds that this is sufficient to create a factual dispute as to whether Senior required prior approval before actions related to the business could be taken. Therefore, the Undersigned has omitted this second sentence from paragraph 30.

[13]    Defendants dispute the portion of paragraphs 35-37 which states they were "no longer authorized by [Senior]." [ECF Nos. 57, ¶¶ 35-37; 67, ¶¶ 35-37]. Defendants do not

36.     Defendants continued to promote on restaurant signs, menus, and other material that the restaurants were "established in 1981."

37.     Defendants continued to promote themselves as being the "Creator de la Crema de la Queso" (meaning "Creator of the Cream of Cheese") on restaurant signs, menus, and other material.

38.     On July 20, 2017, Junior filed a trademark application with the Florida Secretary of State for the mark MONTES DE OCA PIZZA CUBANA (ESTILO VARADERO) for restaurant, food, and pizza (registered as Document No. T17000000956).

39.     Senior did not consent to (nor have knowledge of) Junior's 2017 Florida application for the mark MONTES DE OCA PIZZA CUBANA (ESTILO VARADERO).[14]

40.     In the 2017 Florida mark application, Junior named himself as owner of the applied-for mark and included a document titled "Acknowledgment of Use of Image," purportedly granting Junior the right to use Senior's likeness.

41.     Senior is not the person who signed the document titled "Acknowledgment

---

address the remaining facts in paragraphs 35-37. Therefore, the remaining portion of paragraphs 35-37 is deemed undisputed for purposes of the instant motion.

[14]     Defendants do not dispute that Senior and Gonzalez may not have been aware of this registration. [ECF No. 67, ¶ 39]. They further add that "[it is] disputed that [Senior] and Gonzalez were unaware of the use of the [M]arks by [Junior] and/or the Batabano Defendants." *Id.* This additional sentence is outside the scope of paragraph 39. Therefore, the Undersigned deems paragraph 39 admitted for purposes of the instant motion.

of Use of Image."[15]

42.     Senior and Gonzalez did not have knowledge of the 2017 Florida mark registration until 2018 after consulting with legal counsel who notified them of the existing registration.[16]

43.     Junior voluntarily canceled the 2017 Florida mark registration on May 21, 2019, after Las Originales sued him for fraud.

44.     On August 11, 2017, without Senior's consent, Junior initiated an infringement lawsuit against Peña and his companies.

45.     Gonzalez[17] did not have knowledge of the suit at the time it was filed. She

---

[15]     Defendants do not dispute paragraph 41. [ECF Nos. 57, ¶ 41; 67, ¶ 41]. Instead, they *add* that, as confirmed by their forensic handwriting expert, it was "Gonzalez, Senior's business partner, [who] signed the Acknowledge of Use of Image in her capacity as officer of Las Originales, Pizza, Inc." [ECF No. 67, ¶ 41] However, the report and affidavit of the forensic expert [ECF No. 67-1] filed by Defendants relates to the signature of *Barbara*. There is no mention of *Gonzalez* in the report and affidavit filed with the Court. Therefore, Defendants have not cited to any record evidence that Gonzalez signed the report.

[16]     Defendants do not dispute paragraph 42. Instead, they *add* that "[it is] disputed that [Senior] and Gonzalez were unaware of the use of the [M]arks by Junior and/or the Batabano Defendants." [ECF No. 67, ¶ 42]. This additional sentence is outside the scope of paragraph 42. Therefore, the Undersigned deems paragraph 42 admitted for purposes of the instant motion.

[17]     Plaintiffs state that "Gonzalez, [Senior], and his daughters Barbara and Pilar did not have knowledge of the suit at the time it was filed." [ECF No. 57, ¶ 45]. However, Plaintiffs cite only paragraph 31 of the declaration of Gonzalez. *Id.* In paragraph 31 of her declaration, Gonzalez attests to when *she* learned of the lawsuit. [ECF No. 57-6, ¶ 31]. Therefore, Plaintiffs have not cited to any record evidence of when *Senior and his daughters*

learned of the suit at the end of 2017 when Junior's attorney visited the restaurant located at 4360 NW 7 Street, Miami, Florida and told her.

46.     On May 3, 2018, Junior entered into a purported trademark licensing agreement with Peña.[18]

---

learned of the lawsuit.

Defendants, for their part, dispute this fact "because . . . [they] do not have knowledge of [sic] information when Gonzalez, [Senior], Barbara and Pilar first learned of the suit." [ECF No. 67, ¶ 45]. However, they have not cited to any record evidence creating an issue of fact as to when *Gonzalez* learned of the suit. Therefore, paragraph 45 is undisputed as to Gonzalez and is unsupported by the record evidence as to Senior and his daughters.

[18]     Defendants object to paragraphs 46 and 49 on hearsay grounds but do not engage in any analysis or cite legal authority concerning how these facts are inadmissible hearsay or why a hearsay exception would not apply. [ECF No. 67, ¶¶ 46; 49]. The Undersigned will not consider objections "raised in a perfunctory manner, without supporting arguments and citation to authorities[.]" *N.L.R.B. v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). Moreover, Defendants' hearsay objections are not well-taken because actions are not hearsay. *See FactorTrust, Inc. v. Evanston Ins. Co.*, No. 1:16-CV-02711-LMM, 2018 WL 11350494, at *2 (N.D. Ga. May 24, 2018) (witness's "testimony [was] not hearsay because his testimony [was] about purported events and actions that occurred in the arbitration proceedings as opposed to out-of-court statements offered to prove the truth of the matter they assert").

At the same time, Plaintiffs do not elaborate on the basis for the statement that the actions described in paragraphs 46 and 49 were done "without [Senior]'s knowledge or authorization." [ECF No. 57, ¶¶ 46; 49]. Plaintiffs merely cite the conclusory statement in Gonzalez's declaration that "[i]n May 2018, [Junior] sold [Senior]'s 7th St[.] Restaurant and the Montes de Oca Bakery without [Senior]'s consent and with terms that improperly involve the MONTES DE OCA Marks." [ECF No. 57-6, ¶ 38]. It may be that Senior was incapacitated at the time, but Gonzalez does not state this. So, the Undersigned will omit the portion of paragraphs 46 and 49 which state these actions were taken without Senior's knowledge or authorization.

47.     The May 3, 2018 agreement between Junior and Peña alleges that Junior is the owner of the mark "MONTES DE OCA ORIGINAL PIZZA CUBANA" and purports to grant Peña a license to use said mark.

48.     The May 3, 2018 agreement between Junior and Peña does not identify Senior as a contracting party nor represent that Junior was acting on behalf of Senior.

49.     On May 18, 2018, Junior unilaterally sold Senior's production facility (the "Bakery"), where the pizzas and other food products were made, to Peña.

50.     The May 18, 2018 agreement between Junior and Peña does not identify Senior as a contracting party nor represent that Junior was acting on behalf of Senior.[19]

51.     After learning of Junior's sale of the Bakery and purported license to Peña, Gonzalez complained -- at an unspecified time or times -- to Peña that the sale and license were not authorized by Senior and that it was Senior -- not Junior -- who owned the

---

[19]     Defendants do not dispute this fact. Instead, Defendants add additional facts. The Undersigned notes that Local Rule 56.1 provides a mechanism through which a party opposing summary judgment may add additional facts:

> An opponent's Statement of Material Facts shall clearly challenge any purportedly material fact asserted by the movant that the opponent contends is genuinely in dispute. **An opponent's Statement of Material Facts also may thereafter assert additional material facts that the opponent contends serve to defeat the motion for summary judgment**.

S.D. Fla. L.R. 56.1(a)(2) (emphasis added). Defendants have chosen not to avail themselves of this mechanism. The Undersigned will not continue to note Defendants' additional facts when they do not actually dispute the asserted fact(s).

Marks.[20]

52.    Batabano III was never granted a license by Senior or Monte Pizza to use the Marks.[21]

53.    On December 14, 2018, Plaintiffs sent a cease-and-desist letter to Peña and Yamilin Mederos, demanding that they, and their companies, stop using the Marks.[22]

54.    On December 20, 2018, Defendants' counsel, Yelina Angulo, responded to Plaintiffs' letter stating, "My client's [sic] use of the trademark and tradename is completely lawful and authorized . . . ."

55.    On July 19, 2019, Peña's deposition was taken in *Montes de Oca Jr. v. Las Originales Pizza, Inc.*, Case No. 2018-041326-CA-01 in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida ("Florida Litigation").

---

[20]    The Undersigned will not consider Defendants' conclusory hearsay objection, devoid of any explanation or legal authority [ECF No. 67, ¶ 51]. Nonetheless, as Defendants point out, paragraph 42 of Gonzalez's declaration does not specify *when* she complained to Peña about his use of the Marks.

[21]    Defendants dispute this fact by citing to evidence that *Junior* entered into a purchase agreement with Batabano III. [ECF No. 67, ¶ 52]. However, paragraph 52 concerns Senior and Monte Pizza. Defendants have not cited to any record evidence that Senior and/or Monte Pizza granted a license to Batabano III. Therefore, the Undersigned deems paragraph 52 undisputed for purposes of the instant motion.

[22]    In response to paragraphs 53 and 54, Defendants state that the documents speak for themselves. [ECF No. 67, ¶¶ 53-54]. Defendants do not actually dispute the facts being asserted in these paragraphs. Therefore, the Undersigned deems these facts undisputed for purposes of the instant motion.

56.     Defendants continued to use the Marks even after Monte Pizza obtained a Florida state mark registration for MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) on July 1, 2019.[23]

57.     Batabano III[24] continued to use the Marks even after Monte Pizza's mark application for MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) became a federal registration on June 1, 2021.

58.     Batabano III continued to use the Marks even after it was notified [ECF No. 24] on March 25, 2021, that the court in the Florida Litigation had entered an order granting Plaintiffs' motion for partial summary judgment on the issue of ownership.

---

[23]     Defendants do not dispute that they continued to use the Marks after July 1, 2019. Rather, they seek to add an additional fact -- that they did so lawfully.

Whether Defendants *lawfully* used the Marks is a disputed factual and legal issue in this case. Paragraph 56 merely states that Defendants continued to use the Marks after July 1, 2019. Defendants do not dispute that they continued to use the Marks after that date. Therefore, paragraph 56 is deemed undisputed for purposes of the instant motion.

[24]     In paragraph 57, Plaintiffs state that "*Defendants* continued to use the Marks even after . . . June 1, 2021." [ECF No. 57, ¶ 57 (emphasis added)]. In paragraph 58, Plaintiffs state that "*Defendants* continued to use the Marks even after they were notified . . . on March 25, 2021, that the court in the Florida Litigation entered an order . . . granting Plaintiffs' motion for partial summary judgment on the issue of ownership." *Id.* at ¶ 58 (emphasis added). However, and as Defendants point out, Batabano I and II were no longer in operation by those dates. [ECF No. 67, ¶¶ 57-58]. Moreover, the exhibit cited by Plaintiffs in support of paragraphs 57 and 58 (MG-21) is for the restaurant located at 4360 NW 7th Street, Miami, Florida 33126, the location for Batabano III. Therefore, it is undisputed that *Batabano III* continued to use the Marks after March 25, 2021 and after June 1, 2021.

59.     Batabano III continued to use the Marks even after it was notified . . . on April 26, 2021 by Plaintiffs of the resolution of the Florida Litigation in Plaintiffs' favor.[25]

60.     Through November 8, 2021, Batabano III continued to promote and render restaurant services under the mark MONTES DE OCA through the Uber Eats and Postmates websites and applications.

61.     N/A

**Florida Litigation and Stay of the Instant Proceedings**

62.     On December 12, 2018, Junior initiated the Florida Litigation against Las Originales, his sisters (Pilar and Barbara), and nephew.

63.     At the time of the Florida Litigation, Junior's sisters and nephew were operating (and continue to operate) a restaurant in Hialeah, Florida.

64.     On September 6, 2019, Junior amended his complaint to name as defendants Monte Pizza and Gonzalez.

65.     Junior's operative complaint in the Florida Litigation raised claims of: (1) common law trademark infringement (2) false designation of origin under 15 U.S.C. §

---

[25]     As with paragraphs 57 and 58, Plaintiffs state in paragraph 59 that "*Defendants continued to use the Marks even after they were notified . . . on April 26, 2021, by Plaintiffs of the resolution of the Florida Litigation in [Plaintiffs'] favor.*" [ECF No. 57, ¶ 59 (emphasis added)]. In response to paragraph 59, Defendants merely state: "[d]isputed." [ECF No. 67, ¶ 59]. Ordinarily, Defendants' response would be insufficient. However, and as with paragraphs 57 and 58, the exhibit cited in support of paragraph 59 (MG-21) relates to the location for Batabano III. Therefore, it is undisputed that *Batabano III* continued to use the Marks after March 25, 2021 and after April 26, 2021.

1125(a)(1)(A); (3) unfair competition under Florida law; (4) violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.213 ("FDUTPA"); (5) cancellation of state trademark under Fla. Stat. §§ 495.101 and 495.121; (6) accounting of profits; and (7) slander of title.

66.    Junior's complaint in the Florida Litigation does not allege that he acquired the rights to the Marks from Senior. Instead, Junior alleged that he was and "has been the owner of the trademark and his father was simply his "brand ambassador."

67.    Las Originales filed a counterclaim against Junior for: (1) false designation of origin under 15 U.S.C. § 1125(a)(1)(A); (2) false advertisement under 15 U.S.C. § 1125(a)(1)(B); (3) Florida common law trademark infringement; (4) Florida common law unfair competition; and (5) fraudulent trademark registration cancelation under Fla Stat. § 495.121.

68.    On May 21, 2019, Junior canceled his 2017 Florida registration and Las Originales withdrew its Florida registration cancelation count.

69.    On June 20, 2019, Plaintiffs filed their initial complaint in the instant action asserting claims of: (1) false designation of origin under 15 U.S.C. § 1125(a)(1)(A); (2) false advertisement under 15 U.S.C. § 1125(a)(1)(B); (3) Florida common law trademark infringement; and (4) Florida common law unfair competition.

70.    On July 10, 2019, Peña sat for a deposition in the Florida Litigation and was represented by his counsel, Yelina Angulo.

71.     During this deposition, Peña testified that Junior was the owner of the MONTES DE OCA mark and Junior -- not Senior -- authorized him to use the mark.

72.     On July 31, 2019, Defendants filed a motion to stay the instant action pending a resolution of the Florida Litigation and argued that "[the instant] action involve[d] the same set of facts, parties, and issues which [were] virtually identical to the same set of facts, parties[,] and issues in the Florida Litigation." [ECF No. 8, p. 5].[26]

73.     On September 23, 2019, Peña executed a "Trademark Purchase and Assignment Agreement" with Junior where Peña purported to acquire fifty percent ownership of the mark MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) from Junior. This agreement was not produced, nor known, to Plaintiffs until October 1, 2021, when it was produced by Defendants' counsel during discovery in this case.

74.     On September 25, 2019, this Court stayed the instant action and instructed the parties to provide status updates on the Florida Litigation. [ECF No. 16].

75.     Peña made several payments to the law firm of Junior's counsel in the Florida Litigation (Alcoba Law Group): $1,000 on November 8, 2019, $750 on November 12, 2019, $1,000 on November 18, 2019, $1,000 on November 22, 2019, and $1,000 on

---

[26]     Defendants dispute Plaintiffs' characterization of Defendants' motion to stay and argue that the consent judgment has no preclusive effect. [ECF No. 67, ¶ 72]. Rather than determine whether Plaintiffs' characterization of Defendants' motion is fair, the Undersigned quotes from Defendants' motion.

December 2, 2019.

76.     On January 28, 2021, Plaintiffs sought partial summary judgment in the Florida Litigation on the issue of ownership of the Marks against Junior.

77.     On March 19, 2021, Plaintiffs notified the District Court that they had filed a motion for partial summary judgment on the issue of ownership in the Florida Litigation and that the motion had been granted in their favor during a hearing. [ECF No. 24].

78.     On March 25, 2021, the court in the Florida Litigation entered an order granting Plaintiffs' motion for partial summary judgment on the issue of ownership.

79.     The summary judgment order stated, in part, that: "[t]he Court finds that . . . [Senior] was the first user of the Marks. Accordingly, as [Senior]'s successor in interest, Defendant Monte Pizza is the current owner of the Marks."

80.     On April 19, 2021, Plaintiffs and Junior filed a joint motion for the entry of a consent final judgment and permanent injunction which was granted. The state court entered an Agreed Consent Judgment and Permanent Injunction ("Agreed Consent Judgment") in favor of Las Originales on all claims.

81.     On April 26, 2021, Plaintiffs notified this Court of the resolution of the Florida Litigation and attached copies of the order granting the motion for partial summary judgment on the issue of ownership and the Agreed Consent Judgment against Junior. [ECF No. 26].

82.     On July 22, 2021, the Court restored this case to the active docket.

**Affirmative Defenses**

83.     The only documents Defendants possess that they claim support their allegations of Senior consenting to Defendants' use of his likeness are: the 2009 Agreement, the Assignment and Assumption of Lease dated July 2009, and the Acknowledgment of Use of Image dated July 18, 2017.[27]

84.     The only documents Defendants have to support Senior authorizing their use of the Marks are: the 2009 Agreement; the Assignment and Assumption of Lease dated July 2009; the Acknowledgment of Use of Image dated July 18, 2017; and the Trademark Licensing Agreement between Junior and Barbara.

85.     Defendants do not have any documents to support their affirmative defense of descriptive fair use.

86.     Defendants do not have any documents to support their affirmative defense of nominative fair use.

87.     N/A

**III.    Applicable Legal Standard**

On a motion for summary judgment, the Court must construe the evidence and

---

[27]     Defendants do not actually dispute paragraphs 83-86 relating to their affirmative defenses. Rather, they seek to add either that they are also relying on the defenses of ratification or acquiescence or that no documents are needed to support a particular affirmative defense. Therefore, paragraphs 83-86 are deemed undisputed for purposes of the instant motion.

factual inferences arising therefrom in the light most favorable to the nonmoving party.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment can be entered on

a claim only if it is shown that "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition,

under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary judgment

for the nonmoving party "[a]fter giving notice and a reasonable time to respond." *See*

*Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

    The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment,
> after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden
> of proof at trial. In such a situation, there can be no genuine issue as to any
> material fact, since a complete failure of proof concerning an essential
> element of the non-moving party's case necessarily renders all other facts
> immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).

    The Court's function at this juncture is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A dispute about a material fact

is genuine if the evidence is such that a reasonable factfinder could return a verdict for

the nonmoving party. *Id.* at 248; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.

1989).

    The party moving for summary judgment "always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also* Fed. R. Civ. P. 56(c). To meet this burden, the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.*

## IV.   Analysis

Plaintiffs seek summary judgment on Counts I and III through VI[28] of their

---

[28]     Defendants profess confusion as to the scope of Plaintiffs' motion. [ECF No. 66, p. 1 n.1 ("Plaintiffs' motion is confusing as to its intended scope. The Introduction and Conclusion state Plaintiffs are seeking summary judgment as to 'Counts I and III through VI of the Amended Complaint'. [DE 56 at 1, 14]. The Argument section, however, proceeds to discuss 'Counts I, II, IV and V' [DE 56 at 2, 3].")].

Amended Complaint: false designation of origin in violation of Section 43(a) of the

Lanham Act, 15 U.S.C. § 1125(a) (Count I); Florida common law infringement (Count III);

Florida common law unfair competition (Count IV); federal trademark infringement in

violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 (Count V); and Florida

registered mark infringement in violation of Fla. Stat. § 495.131 (Count VI). [ECF No. 56].

"The elements of a claim for false designation of origin are: '(1) that the plaintiff

had enforceable trademark rights in the mark or name[ ] and (2) that the defendant made

unauthorized use of it such that consumers were likely to confuse the two.'" *Volkswagen

Grp. of Am., Inc. v. Varona*, No. 19-24838-CIV, 2021 WL 247872, at *11 (S.D. Fla. Jan. 25,

2021) (quoting *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1299

(S.D. Fla. 2017)).

"In a [federal] trademark infringement action, the plaintiff must show, first, that

its mark is valid and, second, that the defendant's use of the contested mark is likely to

cause confusion." *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989)

(citing 15 U.S.C. § 1114(1)(a)).

"The analysis under the Lanham Act for trademark infringement also applies to

claims of trademark infringement and unfair competition under Florida common law."

*Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264 n.2 (S.D. Fla. 1999);

---

While Plaintiffs' motion does *reference* Count II, [ECF No. 56, pp. 2, 3], it is clear
from reviewing Plaintiffs' motion and reply, as a whole, that Plaintiffs are *not* moving for
summary judgment on Count II.

*see also Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, No. 20-CIV-61255-RAR, 2020 WL 6700449, at *2 (S.D. Fla. Oct. 20, 2020) ("[T]he Florida common law trademark infringement and unfair competition analysis is essentially the same as the federal trademark infringement analysis."). The same is true for a Florida statutory claim of trademark infringement under § 495.131 of the Florida Trademark Act. *See Heron Dev. Corp. v. Vacation Tours, Inc.*, No. 16-20683-CIV, 2017 WL 5957743, at *12 (S.D. Fla. Nov. 30, 2017) (Moreno, J.) ("To determine the validity of a trademark infringement claim, the Florida Legislature instructs courts to assess the claim under federal law.").

### A.    Defendants Do Not Dispute the Ownership and Validity of the Marks

The ownership and validity of the Marks are not contested. *See* [ECF No. 66, p. 3 ("Defendants agree with Plaintiffs that ownership and validity of the subject [M]arks are not at issue.")]. Plaintiffs are therefore entitled to summary judgment on the issues of ownership and validity of the Marks.

### B.    The State Court Agreed Consent Judgment

Plaintiffs seek to rely on the state court Agreed Consent Judgment [ECF No. 26-2] to establish likelihood of confusion. [ECF No. 56, pp. 4-8].[29]

---

[29]    Plaintiffs also seek to rely on the state court Agreed Consent Judgment to establish the ownership and validity of the Marks. However, and as noted in Plaintiffs' own motion, Defendants do not contest ownership or validity. Therefore, the ownership and validity of the Marks have been established in the instant case, regardless of any preclusive effect of the Agreed Consent Judgment issued in the Florida Litigation.

The doctrine of "[c]ollateral estoppel or issue preclusion forecloses relitigation of an issue of fact or law that has been litigated and decided in a prior suit." *I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986).

"In considering whether to give preclusive effect to state-court judgments under res judicata or collateral estoppel, the federal court must apply the rendering state's law of preclusion." *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011). Here, Plaintiffs cite to a non-Florida, federal case setting forth the elements of issue preclusion. [ECF No. 56, p. 4 (citing *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985))]. This does not affect the Court's analysis, however, because "[a] comparison between Florida rules and federal rules governing claim and issue preclusion reveals that the relevant principles are largely identical." *DeBose v. Ellucian Co., L.P.*, 802 F. App'x 429, 434 n.5 (11th Cir. 2019) (citing *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 764 F.3d 1327, 1337 (11th Cir. 2014)). In addressing issue preclusion, the Undersigned will therefore address the elements of issue preclusion as set forth in Plaintiffs' motion and discussed by the parties.

There are four prerequisites to the application of collateral estoppel:

(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue in the prior litigation must have

---

The Undersigned's analysis of Plaintiffs' issue preclusion argument will therefore be limited to the Agreed Consent Judgment's alleged preclusive effect on the issue of likelihood of confusion (and not ownership and/or validity of the Marks).

been a critical and necessary part of the judgment in that earlier action; and (4) there must have been a full and fair opportunity to litigate the issue in the earlier proceeding.

[ECF No. 56, p. 4 (citing *Greenblatt*, 763 F.2d at 1360)]. Once the elements of collateral estoppel are met, "[t]he application of collateral estoppel is committed to the sound discretion of the district court." *Greenblatt*, 763 F.2d at 1360.

Plaintiffs argue that all four prongs of collateral estoppel are present here.

### i. Identical Issue

According to Plaintiffs, "[t]he first prong is easily met as both" the Florida Litigation and the instant case "are based on ownership of the Marks and the alleged infringement of them." [ECF No. 56, p. 4]. Plaintiffs note that Defendants moved to stay the instant action precisely because the issues in the Florida Litigation were identical to the issues in the instant case and this Court stayed the instant proceedings. *Id.* at 5.

In their response, "Defendants concede that the causes of action asserted by Las Originales in its state court counterclaim and in this action, which consist of related trademark infringement actions, are identical." [ECF No. 66, p. 6].

Therefore, Plaintiffs have met the first prong.

### ii. Actually Litigated

Plaintiffs argue that the second prong is met because "likelihood of confusion [was] . . . actually litigated in the Florida Litigation." [ECF No. 56, p. 5]. Plaintiffs state that "on April 19, 2021, Plaintiffs and [Junior] filed a joint motion for the entry of [a]

consent final judgment and permanent injunction" and "[t]he same day, the Court entered an order for the agreed consent judgment and permanent injunction against [Junior]." *Id.* at 6. Plaintiffs note that:

> The Final Judgment . . . included findings of fact on likelihood of confusion: "Plaintiff/Counter-Defendant's use of designations MONTES DE OCA and MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) for restaurant services is likely to cause confusion, mistake, or deception and constitutes false designation of origin of Defendants/Counter-Plaintiff's services in violation of Section 43 of the Lanham Act (15 U.S.C. § 1125(a)(1)(A))."

*Id.* (quoting Agreed Consent Judgment [ECF No. 26-2]).

Plaintiffs state that "[t]he use examined in the Florida Litigation is the same use to be considered in this case for the likelihood of confusion analysis because [Junior] was the purported licensor of the Marks who granted 'licenses' to the Defendants in this case, who were the ones actually using the Marks but their use would have inured to the benefit of [Junior] since he had alleged to be the owner." *Id.*

"Defendants concede that the issues of validity and ownership appear to have been litigated in the state court action" but note that "the remaining issues in the state court action were disposed via an 'Agreed Consent Judgment and Permanent Injunction.'" [ECF No. 66, p. 7].

In their reply, Plaintiffs state that the parties intended for the Agreed Consent Judgment to have preclusive effect because it "included specific findings of fact on the issue of likelihood of confusion and infringement." [ECF No. 73, p. 2]. Plaintiffs note that:

> The judgment provides, "Plaintiff/Counter-Defendant's use of the designations MONTES DE OCA and MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) for restaurant services is likely to cause confusion, mistake or deception" and "Plaintiff/Counter-Defendant's use of the designations MONTES DE OCA and MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) for restaurant services constitutes an infringement of Defendants/Counter-Plaintiff's common law trademark rights."

*Id.* (quoting [ECF No. 26-2]).

As further evidence of the parties' intent, Plaintiffs note that the Agreed Consent Judgment "included the entry of a permanent injunction against not only [Junior] but also 'those in active concert or participation with Plaintiff/Counter-Defendant.'" *Id.* (quoting Agreed Consent Judgment).[30]

The judge in the Florida Litigation entered summary judgment against Junior on the issue of ownership of the Marks following full briefing on summary judgment motions and a hearing on March 18, 2021. [ECF Nos. 24, ¶¶ 9-10; 26-1]. However, as

---

[30]   Plaintiffs also argue -- for the first time in their reply -- that Defendants violated the injunction contained in the state court Agreed Consent Judgment. [ECF No. 73, p. 2]. The Undersigned will consider the fact that the Agreed Consent Judgment included a permanent injunction for purposes of determining the intent of the parties in the Florida Litigation.

However, the Undersigned will *not* consider Plaintiffs' argument that Defendants violated the state court permanent injunction because that argument was raised for the first time in Plaintiffs' reply brief. *See Katchmore Luhrs, LLC v. Allianz Glob. & Corp. Specialty*, No. 15-23420-CIV, 2016 WL 1756911, at *1 (S.D. Fla. May 3, 2016) ("[I]t is improper for a party to raise a new argument in its reply.").

Defendants note, the remaining issues in the case were disposed by agreement of the parties in the Agreed Consent Judgment.

Thus, the issue of likelihood of confusion was never *truly* litigated in the Florida Litigation in the sense that there was an actual factual/legal determination by the court/jury.

"[S]ettlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear . . . that the parties intend their agreement to have such an effect." *Arizona v. California*, 530 U.S. 392, 414 (2000). "[W]hen the prior action was resolved by consent, the 'actually litigated' element is satisfied if 'the parties specifically agreed to preclude a given issue in the consent decree.'" *In re Newcom*, 619 B.R. 758, 765 (M.D. Fla. 2020) (quoting *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1245 (11th Cir. 1991)).

Here, the language of the Agreed Consent Judgment supports the conclusion that Junior and Plaintiffs intended their agreement to have preclusive effect, particularly when it provides for a permanent injunction. Plaintiffs have met this prong.

### iii.    Critical and Necessary

Plaintiffs argue that the third prong is met because likelihood of confusion is a "necessary element[] for establishing trademark infringement and false designation of origin." [ECF No. 56, p. 6]. Plaintiffs note that the Agreed Consent Judgment included

findings of fact as to the likelihood of confusion and that judgment would not have been entered without a favorable determination on this issue. *Id.*

"Critical and necessary means 'the factual finding was essential to the ultimate decision in the prior case, and that the judgment could not have been entered without it.'" *Lawson v. Dep't of Corr.*, No. 4:04-CV-00105-MP-GRJ, 2015 WL 9906259, at *8 (N.D. Fla. Sept. 30, 2015), report and recommendation adopted, No. 4:04-CV-00105-MP-GRJ, 2016 WL 297710 (N.D. Fla. Jan. 22, 2016) (quoting *In re Trexler*, 528 B.R. 842, 853 (Bankr. N.D. Ga. 2015)).

The entry of a judgment in Plaintiffs' favor on claims of trademark infringement could not have been entered absent a finding of likelihood of confusion. Plaintiffs have met this prong.

### iv.    Full and Fair Opportunity to Litigate the Issue

"A person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation marks omitted). There are, of course, many recognized exceptions to this general rule. For instance, "[a] person who was not a named party to an action will nonetheless be subject to collateral estoppel arising from that action if that person was in privity with a party or virtually represented by a party." *Cook v. State*, 921 So. 2d 631, 635 (Fla. 2d DCA 2005).

Plaintiffs argue that Defendants had a full and fair opportunity to litigate the issue in the Florida Litigation "because of their relationship as purported licensees (and even as purported assignees) of [Junior] and their involvement in the lawsuit including Defendants' financial support of [Junior]." [ECF No. 56, p. 7]. According to Plaintiffs, "there is privity and a substantive legal relationship between Defendants and [Junior] because [Defendants] were his purported licensees, which Defendants even plead as one [of] their affirmative defenses." *Id.*

Plaintiffs also point out that "Peña entered into an agreement with [Junior] on September 23, 2019 (after this case was filed) purportedly assigning fifty percent of the rights to the mark MONTES DE OCA ORIGINAL PIZZA CUBANA," gave a deposition in the Florida Litigation, was aware of the rights asserted by Plaintiffs, and "produced several documents relating to prior agreements with [Junior]." *Id.*

According to Plaintiffs, "Defendants had ample to [sic] time and opportunity to litigate these issues" and in fact "funded [Junior]'s lawsuit by making some payments to" the law firm representing Junior in the Florida Litigation. [ECF No. 56, pp. 7-8].

Plaintiffs also cite to portions of Defendants' motion to stay filed in the instant case:

> In their Motion to Stay, Defendants stated: "The claims before this Court involve identical causes of action between *related parties* that are currently pending before the Eleventh Judicial Circuit Court in and for Miami-Dade County, Florida (the 'Florida State Court')." *See* ECF No. 8 at 2. They describe Defendants in this case and [Junior] in the Florida Litigation as "*closely related*" and "*substantially the same parties*". *See* ECF No. 8 at 3-4.

"This action involves the *same set* of facts, *parties*, and issues which are virtually identical to the *same set* of facts, *parties* and issues in the Florida Litigation."

*Id.* at 8. (quoting [ECF No. 8, p. 5 (emphasis added)]).

Defendants respond that "none of the Defendants in this action were parties to the state court action." [ECF No. 66, p. 7]. In a footnote, they state that "[w]hether Mr. Peña contributed some portion of Junior's legal fees and on what basis or for what purpose, does not make him or any other [d]efendant a party to the proceeding." *Id.* at 7, n.2 (citation to the record omitted). In other words, because they were not named parties, "the Batabano Defendants, Luis Peña[,] and Yamilin Mederos . . . have not had the opportunity to actually litigate infringement and/or confusion." *Id.* at 8.

In their Reply, Plaintiffs point out that Defendants have not explained how they would have litigated the issue of likelihood of confusion differently in state court. [ECF No. 73, p. 3]. They insist that "Peña participated in the state litigation" because "he was subpoenaed for deposition, produced documents, . . . was aware of the litigation" and "[h]is attorney even participated in a contempt hearing involving Peña's and [Junior]'s accountant." *Id.* Plaintiffs also claim that Defendants "financed a good portion" of Junior's legal fees in the state court litigation, citing checks totaling $77,774.99 (some of which were filed in response to Peña's motion for summary judgment). *Id.*

Leaving aside the propriety of citing documents filed in response to a *separate* summary judgment motion, Plaintiffs have not cited any cases for their contention that

footing part of a legal bill makes that payor a de facto party to the litigation. There is no record evidence Peña had control over the Florida Litigation or that he took part in the decision to submit an agreed consent judgment in lieu of proceeding to trial. Moreover, Plaintiffs have not cited to Defendant Yamilin Mederos' involvement or participation in the Florida Litigation.

The Undersigned is not fully persuaded that Defendants (or at least *all* of the Defendants) had a full and fair opportunity to litigate the issue of likelihood of confusion in the Florida Litigation. In any event, even if Plaintiffs have met this prong, it does not *necessarily* follow that the Court should apply the doctrine of issue preclusion here.

At bottom, [t]he actual decision whether to apply collateral estoppel . . . involves equitable considerations[.]" *In re Matter of McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989). "Even if all four requirements are met, the decision to apply collateral estoppel . . . lies within the discretion of the district court." *Hoskins v. City of Atlanta*, No. 1:15-CV-0508-AT-CMS, 2016 WL 11544122, at *3 (N.D. Ga. June 14, 2016), report and recommendation adopted, No. 1:15-CV-0508-AT, 2016 WL 11544121 (N.D. Ga. July 19, 2016) (citing *In re McWhorter*, 887 F.2d at 1566).

Here, Defendants were not named parties to the Florida Litigation. Defendant Yamilin Mederos does not appear to have participated in the Florida Litigation. The issue of likelihood of confusion was decided by agreement between Junior and Plaintiffs rather than on summary judgment or after a trial. Moreover, and as discussed below, the record

in the instant case supports a finding of likelihood of confusion as a matter of law. Therefore, there is no need to resort to a judge-made doctrine to establish a critical element of Plaintiffs' infringement claims.

In sum, the Undersigned **respectfully recommends** that the District Court exercise its discretion and not ascribe preclusive effect to the Agreed Consent Judgment issued in the Florida Litigation.

### C.      Likelihood of Confusion

Alternatively, Plaintiffs argue that even if the Agreed Consent Judgment has no preclusive effect on this case, Plaintiffs are still entitled to summary judgment as a matter of law on the issue of likelihood of confusion. [ECF No. 56, p. 8 ("[T]here are no genuine disputes as to likelihood of confusion for the infringing use of the identical federally and state registered mark.")].

"Defendants do not dispute that the marks at issue are identical or that the services rendered under the marks are identical." [ECF No. 66, p. 8]. However, they contend that "[a]ll other indicia of likelihood of confusion weigh in favor of . . . Defendants, not Plaintiffs." *Id.*

"[T]he touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007). In determining the likelihood of confusion, the Eleventh Circuit

applies the following seven-factor test:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public.

*Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007). "[C]ourts evaluating likely confusion in a false designation of origin claim consider the same seven factors as those . . . [utilized] in the context of a trademark infringement claim." *Bentley Motors Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1314 (M.D. Fla. 2013) (citing *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 648).

"Although likelihood of confusion is a question of fact, it may be decided as a matter of law." *Tana v. Dantanna's*, 611 F.3d 767, 775, n.7 (11th Cir. 2010); *see also JHO Intell. Prop. Holdings, LLC v. Ignite Int'l, Ltd.*, No. 21-CV-60451, 2022 WL 1486888, at *8 (S.D. Fla. May 10, 2022) (noting that "[t]he Eleventh Circuit has routinely affirmed district courts that have 'weighed' the likelihood-of-confusion factors on summary judgment").

The Eleventh Circuit has cautioned, however, that this seven-factor test "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 649 (quoting *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1342 (11th Cir. 1999)). "After making subsidiary findings as to each factor, a court must also make an ultimate finding

as to the likelihood of confusion based on the 'overall balance' of the factors." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL 4438518, at *6 (11th Cir. Sept. 28, 2021) (citing *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 649).

Among the seven factors, the type of trademark and actual confusion are the most important factors. *Frehling*, 192 F.3d at 1335. Nonetheless, "[a] court must 'fully consider the seven factors, . . . evaluate the weight to be accorded the individual factors, which varies with the circumstances of the case, and then make its ultimate decision only after doing so.'" *Tuna Fam. Mgmt Inc. v. All Tr. Mgmt. Inc.*, No. 20-14017-CIV-SMM, 2022 WL 2257008, at *8 (S.D. Fla. June 22, 2022) (quoting *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 794 (11th Cir. 2020)).

### a.   Distinctiveness/Strength of Marks

Plaintiffs do not address this factor in their motion. They address it only in their reply. [31] They note that they "own state and federal registrations for at least one of the marks in this litigation." [ECF No. 73, p. 6].[32]

---

[31]   Ordinarily, the Undersigned would not recommend that the Court find likelihood of confusion exists as a matter of law when the movant fails to address three of the seven factors until the reply brief. *See Katchmore Luhrs, LLC*, 2016 WL 1756911, at *1 ("[I]t is improper for a party to raise a new argument in its reply."). However, Defendants did not object on this ground and the record here reveals no genuine issue of material fact on the issue of likelihood of confusion.

[32]   Plaintiffs are referring to the MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) Mark. *See* [ECF No. 37-15].

"The fact that a [m]ark is registered indicates that it is deserving of strong protection." *Tuna Fam. Mgmt Inc.*, 2022 WL 2257008, at *10 (citing 15 U.S.C. § 1057(b)). Here, the MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO VARADERO) mark is registered for restaurant services. *See* [ECF No. 37-15]. The Undersigned therefore finds that it qualifies for strong protection.

Plaintiffs do not directly address the strength of the "MONTES DE OCA" mark. The "MONTES DE OCA" mark consists of only a surname. "Names—both surnames and first names—are regarded as descriptive terms . . ." *Tana*, 611 F.3d at 774. "A descriptive mark may become distinctive, and thereby receive protection, if it acquires 'secondary meaning,' i.e., 'when the primary significance of the term in the minds of the [consuming] public is not the product but the producer.'" *Direct Niche, LLC v. Via Varejo S/A*, No. 15-CV-62344, 2017 WL 5952896, at *7 (S.D. Fla. Aug. 10, 2017), aff'd, 898 F.3d 1144 (11th Cir. 2018) (quoting *Welding Servs.*, Inc., 509 F.3d at 1358) (alteration in original)).

Nonetheless, Defendants do not dispute that "[t]he Marks are valid, subsisting, and distinctive." [ECF No. 57, ¶ 19; 67, ¶ 19]. The Undersigned thus finds that this first factor weighs strongly in Plaintiffs' favor as to both marks.

### b.   Similarity of Marks

In assessing this factor, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters., Inc.*, 192 F.3d at 1337.

Defendants do not dispute that the marks at issue are *identical*. [ECF No. 66, p. 8]. Therefore, this factor weighs strongly in favor of Plaintiffs.

### c.   Similarity of Products and Services the Marks Represent

Defendants do not dispute that the services rendered under the Marks are *identical*. [ECF No. 66, p. 8]. In the instant case, Plaintiffs and Defendants both use the Marks in connection with pizzerias. Therefore, this factor weighs strongly in favor of Plaintiffs.

### d.   Similarity of Sales Outlets and Customer Base

Plaintiffs do not address this factor in their motion. They address it only in their reply. Plaintiffs state that "[t]he channels of distribution are identical since it is undisputed that Defendants are occupying the same locations that Plaintiffs' predecessor occupied." [ECF No. 73, p. 6].

"This factor takes into consideration where, how, and to whom the parties' products are sold." *Frehling*, 192 F.3d at 1339. This factor weighs heavily in Plaintiffs' favor. Defendants' pizzeria restaurants operated out of the same locations where Plaintiffs' predecessors had, in the past, operated pizzeria restaurants.

### e.   Similarity of Advertising

Plaintiffs do not address this factor in their motion. They address it only in their reply. Plaintiffs state that "the advertising media used are the same including Uber [Eats], Postmates, etc. and the internet in general." [ECF No. 73, p. 6].

This factor also weighs in Plaintiffs' favor. *See Pro Video Instruments, LLC v. Thor Fiber, Inc.*, No. 6:18-CV-1823-GAP-LRH, 2020 WL 11421203, at *10 (M.D. Fla. Apr. 22, 2020) (finding factor "weigh[ed] in [the] [p]laintiff's favor as both parties advertise their products on the internet, mostly via their own websites, Google ads, and at trade shows").

     **f.**    **Intent**

"Although intent is not an essential element of a trademark infringement cause of action, it is a relevant consideration in evaluating whether the infringing use is likely to cause confusion." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 n.4 (11th Cir. 1991). Plaintiffs contend that "[t]he infringement in this case is willful and this should strongly weigh in favor of a likelihood of confusion." [ECF No. 56, p. 9].

According to Plaintiffs:

> the previous business relationship between the parties demonstrates . . . Defendants' willful infringement. In 2013, Plaintiffs' predecessor in interest [Senior] granted a revocable oral license to Luis Peña and his companies Batabano I and II to use the marks conditioned on their purchasing food products (pizza shells and garlic bread) from [Senior]. Once Defendants' [sic] ceased buying the products from [Senior] in 2017, the agreement was terminated. Despite knowing that [Senior] and not [Junior] owned the [M]arks, Defendants continued to use the Marks without [Senior]'s (and Monte Pizza's) authorization.

> Further, Plaintiff[s'] [counsel] sent a letter on December 14, 201[8] to Defendants requesting that Defendants cease and desist from using the offending designations. Defendants refused and continued the infringement after having received notice from Plaintiff. Defendants continued their infringing use of the Marks after Plaintiffs obtained a Florida state trademark registration (July 1, 2019) and federal registration (June 1, 2021), both of which should serve as constructive notice. And Defendants even continued their infringing use of the Marks after Plaintiffs

> obtained in the Florida Litigation a favorable summary judgment decision as to the issue of ownership and later a final judgment in their favor, which Plaintiffs provided notice to the Court of as instructed on March 25, 2021 and April 26, 2021, respectively. Plaintiffs have provided evidence of Defendants' continued infringing use through photographs dated March 25, 2021 of Defendants' restaurant showing the Marks, credit card receipts dated July 14 and 19, 2021 produced by Defendants identifying the restaurant using the name Montes de Oca Original Pizza, and screenshots dated November 8, 2021 of Defendants' UberEats [sic] listing promoting and offering restaurant services using the MONTES DE OCA mark.

*Id.* at 10 (citations to the record omitted). Plaintiffs contend that the evidence in this case establishes that "Defendants' past and continued infringement is willful." *Id.*

Defendants argue that the parties' long-standing business relationship cuts against a finding of intent: "the previous business relationship clearly demonstrates . . . Defendants reasonably believed they were authorized or licensed to use the Marks, and therefore intended to use the Marks in conjunction with their respective purchases of restaurant facilities and licenses." [ECF No. 66, pp. 8-9]. Defendants further reiterate that

> Peña, through the Batabano entities, at all relevant times was using the subject Marks pursuant to contractual agreements that are facially valid and to which the Plaintiffs and their predecessors in interest never timely objected. The record evidence shows the use of the subject Marks was either through the express authority of Senior, as pertains to Batabano I, or the apparent authority of Junior coupled with Plaintiffs' acquiescence as pertains to Batabano II and Batabano III. At all relevant times[,] Mr. Peña, in his capacity as officer of the respective Batabano Defendants, had a good faith belief that the Batabano Defendants were authorized to use the subject Mark[s].

*Id.* at 9. According to Defendants, "[t]he record is devoid of evidence that any [d]efendant, including Mr. Peña individually or in his capacity as an officer for the corporate defendants, intended to infringe Plaintiffs' Marks." *Id.*

In their reply, Plaintiffs note that "intent is not a required factor for the legal determination of likelihood of confusion" and that "[i]t is [merely] an aggravating factor." [ECF No. 73, p. 4]. Plaintiffs then proceed to accuse Defendants of conspiring with Junior:

> In 2017, [Senior] suffered a heart [sic] massive attack and Defendants took advantage of this and conspired with [Junior] to acquire a purportedly perpetual license to the Marks. Defendants willfully sought to benefit from the goodwill Plaintiffs' predecessor had developed and, as such, Defendants' intent should be weighed in favor of a finding of a likelihood of confusion.

*Id.* at 5.

"When analyzing an alleged infringer's intent, [the Court] must determine whether the defendant 'adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation.'" *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 940 (11th Cir. 2010) (quoting *Frehling*, 192 F.3d at 1340). "[B]ad faith on the part of the defendant is not a prerequisite to a finding of likely confusion." *Vineyard Vines, LLC v. Outlet Tent Sales, LLC*, No. 3:19-CV-0036-TCB, 2019 WL 8277260, at *6 (N.D. Ga. Sept. 10, 2019). And, "[w]here there is identical copying, it may be appropriate to infer the defendants intended to benefit from the plaintiff's reputation."

*Abercrombie & Fitch Trading Co. v. Importrade USA, Inc.*, No. 07-23212-CIV, 2009 WL 10668435, at *7 (S.D. Fla. June 26, 2009).

Here, Defendants used Plaintiffs' *exact* Marks and the use of the Marks was for the purpose of deriving an economic benefit. This factor, therefore, also weighs in favor of Plaintiffs.

### g.      Actual Confusion

"The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion." *Tana*, 611 F.3d at 779. Courts "look not only to the existence but also to the extent of such confusion." *Id.*

Plaintiffs cite what they contend is evidence of actual customer confusion:

> there have been instances of actual confusion due to Defendants' continued infringement. Confused customers have gone to Las Originales' Montes de Oca restaurant to pick up food orders that were not made or paid to Las Originales. These customers paid and placed the orders with Defendants' 4360 NW 7th Street restaurant but, out of confusion, came to [Plaintiffs'] restaurant to pick up their orders instead.

[ECF No. 56, p. 11].

In their response, Defendants note that "[t]he customers are not identified, nor is there any indication of the dates and circumstances of these alleged events. Such assertions are simply not enough to constitute a likelihood of confusion." [ECF No. 66, p. 9]. They further insist that "the confusion to which Plaintiffs allude is as to the *location of the restaurants*, not the authenticity of the Mark" and that because at all relevant times

Defendants were allegedly authorized to use the Marks, Plaintiffs "cannot now be heard to complain of any supposed actual confusion." *Id.* at 10 (emphasis in original).

In evaluating this factor, some courts have found that a single instance of customer confusion or instances that are insufficiently detailed are not enough to support a finding of actual confusion. *See*, *e.g.*, *Superior Consulting Servs.*, 2021 WL 4438518, at *10 ("Given the vague and irrelevant calls, one confused distributor, and the uncontested expert testimony that there was little-to-no actual confusion, the district court was entitled to weigh the evidence and conclude that the actual confusion factor weighed heavily for [the defendant].") . On the other hand, the Eleventh Circuit has observed "that one instance of actual confusion can sometimes be enough." *Superior Consulting Servs., Inc.*, 2021 WL 4438518, at *9.

In the instant case, the Undersigned agrees with Defendants that Plaintiffs' evidence of actual confusion is insufficiently detailed to conclude that this factor weighs in favor of Plaintiffs. Nonetheless, and for the reasons discussed below, that does not mean Plaintiffs have not established a likelihood of confusion as a matter of law.

### h.    Overall Balance

The Undersigned now considers the "overall balance" of the seven factors. *See Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 649. Considering the evidence in the light most favorable to Defendants, six of the seven factors weigh in Plaintiffs' favor and only

Plaintiffs' proffered evidence of actual confusion is insufficiently detailed to support a finding in favor of Plaintiffs on the last factor.

Courts applying the seven-factor test have found it satisfied even in instances where not all of the factors are met. *See., e.g. Abercrombie & Fitch Trading Co.*, 2009 WL 10668435, at *8 (finding likelihood of confusion as a matter of law despite no evidence of actual confusion); *Bell v. Foster*, No. 1:13-CV-405-TWT, 2013 WL 6229174, at *4 (N.D. Ga. Dec. 2, 2013) (finding a likelihood of confusion existed where six factors weighed in favor of the plaintiff, but the plaintiff had "not supplied any evidence of actual confusion").

Here, Defendants operated three pizzeria restaurants using Plaintiffs' *exact* Marks and from the *same* locations where Plaintiffs' predecessors had operated pizzeria restaurants using these Marks. Based on the undisputed record evidence, the only reasonable conclusion is that Defendants' use of the Marks likely confused consumers.

The Court should find that likelihood of confusion has been established as a matter of law.

### D.     Whether Defendants' Use of the Marks Since 2017 was Authorized

Plaintiffs move for summary judgment on Defendants' eighth affirmative defense. [ECF No. 56, pp. 11-12]. In their eighth affirmative defense, Defendants state as follows:

> As an eighth affirmative defense, Defendants state that any usage of the subject marks were pursuant to an agreement with [Senior], as well as lawfully executed license [sic] between Defendants and [Junior] and/or [Junior]'s authorized agents.

[ECF No. 38, ¶ 97].

Plaintiffs argue that Defendants cannot rely on the 2009 Agreement because it was entered into between Alexis Mederos (and not Defendants) and contains "a clause stating the rights and obligations under the agreement could not be transferred." [ECF No. 56, p. 11]. Plaintiffs further argue that "even if the 2009 [Agreement] applied to Defendants, they are outside the period that Plaintiffs contend constitutes the infringement period (2017 onwards) and there is nothing in the [2009] [A]greement suggesting the license could not be terminated." *Id.*

Plaintiffs further argue that Defendants cannot rely on "the Acknowledgment of Use of Image dated July 18, 2017" because it "does not constitute a trademark license." [ECF No. 56, p. 11]. They further argue that this document was not signed by Senior and, even if the document had been signed by Senior, it "does not confer any rights to Defendants as they are not named in the document and it only mentions use of [Senior]'s face not the use of the Marks." *Id.* at 11-12.

Plaintiffs reiterate *their* version of the facts:

In 2013, [Senior] orally granted Peña and his companies Batabano I and II a revocable and non-exclusive license to use the Marks at his restaurants contingent on Mr. Peña and his companies purchasing food products (e.g.[,] pizza shells and garlic bread) from [Senior]. This oral license was terminated in 2017 when Peña and his companies Batabano I and II ceased purchasing food products from [Senior]. Plaintiffs even sent a cease-and-desist letter to Defendants on December 14, 201[8], which Defendants admit receiving and yet refused to comply.

*Id.* at 12 (citation to the record omitted). However, Defendants are not seeking to rely on an *oral* license.

46

Plaintiffs also argue that "Defendants have no evidence that the license to use the Marks was irrevocable" and note that "[t]here are no agreements providing for an irrevocable license between [Senior] or Plaintiffs and the Defendants." [ECF No. 56, p. 12].

Lastly, Plaintiffs argue "the license purportedly granted to Defendants by [Junior] . . . would not allow Defendants to escape liability because it was already established in the Florida Litigation that [Junior] was not the owner of the Marks, but instead [Senior] was the original owner and he assigned the Marks to Monte Pizza." [ECF No. 56, p. 12].

Defendants refer to this portion of Plaintiffs' motion as "[a] confusing hodgepodge of facts strewn together" and respond by proffering their own version of the facts:

> In 2018, Luis Peña, through Batabano Group, Inc. III ("Batabano III") acquired a license to use the marks from Junior (who purported to act on behalf of the corporate entity and/or Senior) at the location 4360 NW 7th Street, Miami, Florida 33126. Notably, this was the third virtually identical transaction in which Mr. Peña, through a Batabano entity, purchased a Montes de Oca location and the right to utilize the name and the Marks at that location. Junior had been a participant in the prior transactions, including provisions [sic] in both the Batabano I and Batabano II Agreements expressly providing that Junior would conduct quality control inspections. The agreement for the Batabano Group III, Inc., location expressly provided Mr. Peña and [Yamilin] Mederos a perpetual license to use the subject Marks. Thus, from a course of dealing over the years that provided apparent authority, Mr. Peña reasonably believed Junior was actually working with and on behalf of the corporate entity and/or Senior when he entered into the Batabano III transaction.
>
> ***
>
> [T]he purchase agreement governing the Batabano III location expressly provides that Junior owns several pizza restaurants known as 'Montes de

Oca Pizza Cubana and the trademark 'Montes de Oca Pizza Cubana', and has several licensing agreements with individual restaurants to use the trademark and to provide them products pursuant to their agreements. Based on the history of dealings, including two virtually identical prior transactions and the ongoing purchase of Montes de Oca products, Mr. Peña, again, had a good faith belief in the validity of this transaction.

Neither Plaintiff [sic] nor any of Plaintiffs' predecessors in interest objected to the aforementioned sale, although they had full knowledge of the transaction. Instead, they acquiesced by removing their personal property from the NW 7th Street location and by physically handing Mr. Peña the keys, rather than taking any action to stop the transaction. The delay exhibited by Plaintiffs in seeking to enforce their Marks against Mr. Peña in his capacity as an officer of the Batabano Defendants severely prejudices Mr. Peña in that he understood his use of the marks to be pursuant to lawful transactions and consent of the appropriate parties.

[ECF No. 66, pp. 10-11]. Defendants further note that Gonzalez admitted to having contemporary knowledge of Junior's sale of the restaurant to Batabano III. *Id.* at 11.

In their reply, Plaintiffs note that "[n]one of the purported agreements that Defendants entered into with [Junior] involving the Marks identify [Senior] or Plaintiffs as contracting parties nor make any reference [to] [Junior] acting on behalf of [Senior] or Plaintiffs." [ECF No. 73, pp. 6-7]. They further note that Defendants admitted "they have no knowledge whether [Senior], knew of or authorized the transaction." *Id.* at 7 (citing [ECF No. 57, ¶¶ 46, 49]). According to Plaintiffs, "[t]he plain language of the agreements and Peña's past business dealings with [Senior] make it unreasonable for Defendants to believe that [Junior] acted with authority." *Id.* at 7.

Plaintiffs also argue that Defendants did not plead an affirmative defense of acquiescence in their Answer. [ECF No. 73, p. 7]. Noticeably absent from Plaintiffs'

argument, however, is any claim of prejudice. "When a plaintiff has notice that an affirmative defense will be raised at trial, the failure of the defendant to plead the affirmative defense does not prejudice the plaintiff, and it is not error for the district court to hear evidence on the issue." *Hewitt v. Mobile Rsch. Tech., Inc.*, 285 F. App'x 694, 696 (11th Cir. 2008).

Plaintiffs further argue that this affirmative defense is inapplicable here:

> Defendants contend that Plaintiffs acquiesced by "removing their personal property from the NW 7th Street location and by physically handing Mr. Peña the keys, rather than taking any action to stop the transaction." However, by handing Mr. Peña the keys to the office of the restaurant, Ms. Gonzalez did not consent to nor encourage Mr. Peña's use of the Marks. The sale of the restaurants is not at issue in this proceeding—the sale of the restaurant is not the same as the sale of a trademark. This is even readily apparent in the purported agreements under which Defendants base their claims: the purchase agreements for the bakery (ECF No. 57-6 at p. 213) and purchase agreement (ECF No. 61-7) for the NW 7th Street restaurant are separate and distinct agreements from the trademark licensing agreement (ECF 57-6 at p. 199). Furthermore, at the time of handing in the keys, Ms. Gonzalez was not aware that [Junior] had sold [Senior]'s Bakery (the production facility) to Peña nor purportedly granted a perpetual license to Peña, without [Senior]'s consent, to use the MONTES DE OCA marks.

*Id.* at 7-8 (some citations to the record omitted). Plaintiffs note that three months after the sale of the restaurant to Batabano III, they sent a cease-and-desist letter and "Defendants have yet to provide any support for how a mere three-month delay was unreasonable or prejudicial to Defendants, which is required for establishing a defense of acquiescence." *Id.* at 8.

In the instant case, the parties dispute the facts underlying Defendants' claims of authorized use of the Marks either through a license in the case of Batabano I or apparent authority/acquiescence based on the parties' course of dealings and Junior's representations. The Court cannot resolve these disputes without making credibility determinations.

Plaintiffs are therefore not entitled to summary judgment on Defendants' alleged unlawful use of the Marks.

### E.    Defendants' Other Affirmative Defenses

#### i.    Descriptive Fair Use

Plaintiffs seek summary judgment on Defendants' first affirmative defense, descriptive fair use, because Defendants do not explain "how they are using the [M]ark[s] descriptively nor how [Defendants' use of the Marks] would constitute fair use." [ECF No. 56, p. 13].

"In descriptive fair use[,] the defendant utilizes plaintiff's mark not to identify plaintiff's product, but merely to describe his own." *Eli Rsch., LLC v. Must Have Info Inc.*, No. 2:13-CV-695-FTM-38CM, 2015 WL 5934611, at *6 (M.D. Fla. Oct. 6, 2015). "Descriptive fair use is an absolute defense to a Lanham Act claim if the defendant's use of a term 'charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party.'" *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, No.

812CV01479T27MAP, 2014 WL 12597067, at *2 (M.D. Fla. July 15, 2014) (quoting 15 U.S.C.

§ 1115(b)(4)).

Defendants' response to this challenge is succinct and conclusory:

Plaintiffs argue that Defendants cannot prove their defense of descriptive fair use because Defendants have submitted no documents in support of this defense. In a descriptive fair use the defendant utilizes plaintiffs' marks to describe his own. *See, e.g.,* 4 McCarthy on Trademarks and Unfair Competition § 23:11 (4th ed.). **The Defendants used the Marks to describe their products: Montes de Oca pizza, as they were contractually authorized to do. The defense of descriptive fair use and [sic] should be allowed to proceed to trial**.

[ECF No. 66, p. 12 (emphasis added)].

"[O]n a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that [an] affirmative defense is applicable." *Top Tobacco, L.P. v. Star Importers & Wholesalers, Inc.*, No. 1:19-CV-4939-MLB, 2021 WL 4081627, at *11 (N.D. Ga. Sept. 7, 2021). Defendants have not carried their initial burden with respect to their descriptive fair use affirmative defense. Defendants do not cite to record evidence supporting the elements of a descriptive fair use defense.

"[T]he mere assertion of affirmative defenses on which the defendant has the burden, without supporting evidence, is insufficient to withstand [a] motion for summary judgment." *Pedraza-Victoria v. Villa Bellini Ristorante & Lounge Inc.*, No. 8:18-CV-1556-T-36JSS, 2020 WL 224531, at *3 (M.D. Fla. Jan. 15, 2020). Here, Defendants have done little more than recite counsel's ipse dixit assertion that this affirmative defense applies to this case.

Plaintiffs are therefore entitled to summary judgment in their favor on the affirmative defense of descriptive fair use.

### ii.    Nominative Fair Use

Plaintiffs also seek summary judgment on Defendants' affirmative defense of nominative fair use. Defendants state that they have withdrawn this affirmative defense. [ECF No. 66, p. 12]. Accordingly, Plaintiffs' summary judgment motion should be denied as moot as to this affirmative defense.

### F.    Alleged General Deficiencies in Defendants' Response

At the end of their reply brief, Plaintiffs introduce a new section entitled, "[g]eneral deficiencies in Defendants' response." [ECF No. 73, pp. 8-9]. Plaintiffs argue that "Peña's statements regarding the restaurant purchase and license being for his benefit from [Alexis] Mederos are false" because Defendants have not introduced corroborating testimony to support Peña's testimony, Defendants did not cross-examine Alexis Mederos about his business relationship with Peña, and Yamilin Mederos (Alexis Mederos' sister) did not file an affidavit supporting Peña's claims about Alexis Mederos being Peña's business partner. *Id.* at 9. Plaintiffs also note that Junior's deposition was not taken and he did not file an affidavit "to verify Peña's allegations." *Id.*

Plaintiffs' arguments in this section can be boiled down to a claim that the Court should not believe Peña because he is purportedly lying. However, it is well-established that the Court cannot make credibility determinations at this juncture. *See Anderson*, 477

U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Moreover, "[e]ven self-serving and uncorroborated statements can create an issue of material fact." *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021), cert. denied sub nom. *Mortg. Invs. Corp. v. United States ex rel. Bibby*, 141 S. Ct. 2632, 209 L. Ed. 2d 757 (2021) (citing *United States v. Stein*, 881 F.3d 853, 856 (11th Cir. 2018) (en banc)); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("As a general principle, a [litigant]'s testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."); *Mangesh v. Stokes*, No. 3:16CV446-MCR-GRJ, 2018 WL 3142940, at *1 (N.D. Fla. June 27, 2018) ("Credibility determinations are not proper on summary judgment, and even self-serving testimony can be a basis for denying summary judgment.").

Peña filed an affidavit (and gave sworn deposition testimony) under penalty of perjury. If it later turns out that he was not truthful, then he (and perhaps his counsel)[33]

---

[33]    *See Perez v. City of Hialeah*, No. 19-24047-CIV, 2021 WL 3772377, at *12, n.2 (S.D. Fla. Aug. 24, 2021) ("An attorney cannot knowingly put on trial testimony he knows in advance will be perjurious. Florida Bar Rule 4–3.3(a)(4). Allowing a client to perpetrate fraud upon the court by introducing false testimony warrants disbarment." (citing *The Fla. Bar v. Agar*, 394 So. 2d 405, 406 (Fla. 1980)).

will need to deal with the fallout. However, the Court cannot now weigh the credibility of one witness (or form of evidence) over another and enter summary judgment in Plaintiffs' favor on this ground.

## V.    Conclusion

In sum, Plaintiffs (1) are entitled to summary judgment in their favor on the issue of ownership and validity of the marks; (2) have shown a likelihood of confusion as a matter of law and are entitled to summary judgment in their favor on that issue; and (3) are also entitled to summary judgment on the descriptive fair use defense. Defendants have withdrawn their nominative fair use defense. The case should proceed to trial on the remaining affirmative defenses. All other aspects of Plaintiffs' summary judgment motion should be denied.

For the foregoing reasons, the Undersigned **respectfully recommends** that the Court **grant in part and deny in part** Plaintiffs' summary judgment motion, as summarized above.

## VI.    Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Federico A. Moreno. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue

covered in the Report and shall bar the parties from attacking on appeal unobjected-to

factual and legal conclusions contained in this Report except upon grounds of plain error

if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140,

149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

      **RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on July 18,

2022.

_____

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Federico A. Moreno
All Counsel of Record