UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**MIAMI DIVISION**

**CASE NO. 19-22553-CIV-MORENO/GOODMAN**

LAS ORIGINALES PIZZA INC.,
a Florida corporation and
MONTE PIZZA INC., a
Florida corporation,

      Plaintiffs,

v.

BATABANO GROUP, INC.,
a Florida corporation; BATABANO
GROUP II, INC., a Florida corporation;
BATABANO GROUP III, INC.,
a Florida corporation; LUIS PEÑA,
individually; and YAMILIN MEDEROS,
individually,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON DEFENDANT PEÑA'S
SUMMARY JUDGMENT MOTION**

      In this trademark-infringement case, Las Originales Pizza Inc. and Monte Pizza

Inc. (collectively, "Plaintiffs") sued Batabano Group, Inc. ("Batabano I"), Batabano Group

II, Inc. ("Batabano II"), Batabano Group III, Inc. ("Batabano III"), Luis Peña ("Peña"), and

Yamilin Mederos (collectively, "Defendants"), alleging that Defendants infringed on the

"MONTES DE OCA" and "MONTES DE OCA ORIGINAL PIZZA CUBANA (ESTILO

VARADERO)" marks (collectively, the "Marks").

Peña filed a summary judgment motion, Plaintiffs filed an opposition response, and Peña filed a reply. [ECF Nos. 60; 68; 81]. Peña also filed a statement of facts, Plaintiffs filed a response to the statement of facts, and Peña filed a reply. [ECF Nos. 61; 69; 82].

Senior United States District Judge Federico A. Moreno referred[1] to the Undersigned Peña's summary judgment motion for a Report and Recommendations. [ECF No. 83]. For the reasons stated below, the Undersigned respectfully recommends that the District Court **deny** Peña's summary judgment motion.

## I.    Background

Plaintiffs allege the following causes of action against all Defendants: false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count II); Florida common law infringement (Count III); Florida common law unfair competition (Count IV); federal trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 (Count V); and Florida registered mark infringement in violation of Fla. Stat. § 495.131 (Count VI). *See* Amended Complaint [ECF No. 37].

---

[1]    Judge Moreno also referred to the Undersigned the summary judgment motions [ECF Nos. 56; 58; 99] filed by Plaintiffs, Batabano I, and Yamilin Mederos. *See* Referral Orders [ECF Nos. 83; 101]. The Undersigned will address those motions in separate Reports and Recommendations.

Peña seeks summary judgment in his favor on the grounds that: (1) at all relevant times, he was authorized to use the Marks and (2) he cannot be held individually liable because, at all times, he was acting in his capacity as an officer of Batabano I, Batabano II and/or Batabano III. [ECF No. 60].

## II.    Undisputed Facts[2]

1.    Batabano I was a Florida Profit Corporation incorporated on June 19, 2009 as "Batabano Group, Inc." Batabano II was a Florida Profit Corporation incorporated on October 3, 2011 as "Batabano Group II, Inc." Batabano III is a Florida Profit Corporation incorporated on August 22, 2018 as "Batabano Group III, Inc."

2.    Beginning at least in 2012,[3] Peña controlled the operation of the restaurant

---

[2]    The facts are generated from the paragraphs in the statement of facts or response to the statement of facts which Plaintiffs expressly agreed are undisputed. [ECF Nos. 61; 69; 82]. For those purported facts which the opposing party classified as partly disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by the parties. The abbreviation, "N/A," means that the paragraph is disputed. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

[3]    Plaintiffs dispute that Peña controlled the operation of the restaurants from 2009 through 2011. [ECF No. 69, ¶ 2]. (By using the term "restaurants," Plaintiffs appear to be referring to the restaurants associated with Batabano I and Batabano II, given that Batabano III was incorporated in 2018). However, Plaintiffs address only Batabano I in their response to paragraph 2. *Id.* With respect to Batabano I, Plaintiffs have shown that there is a genuine issue of material fact as to whether Peña controlled the operation of this restaurant before 2012. (Plaintiffs acknowledge that "Peña appears to become a shareholder of Batabano I in 2012."). Plaintiffs cite to the articles of incorporation, the

located at 455 Hialeah Drive, Hialeah, Florida 33010 (Batabano I). At all relevant times, Peña controlled the operation of the restaurants located at 1740 Palm Avenue, Hialeah, Florida 33010 (Batabano II) and 4360 NW 7 St Miami, Florida 33126 (Batabano III).

3.      On or about June 2009, Manuel Montes de Oca ("Senior") and Maria C. Gonzalez ("Gonzalez"), as sellers, entered into an As Is Purchase and Sale Agreement ("2009 Agreement") with Alexis Mederos, as buyer, whereby Alexis Mederos purchased the restaurant known as "Montes de Oca Original Pizza Cubana" located at 455 Hialeah Drive, Hialeah, Florida 33010. The 2009 Agreement stated, in part, that:

> [s]o long as the existing lease is in effect, the Buyer shall use the name 'Montes de Oca Pizza Cubana' for the Restaurant" and that [t]he Buyer further agrees to purchase from the Seller the pizza shells and the garlic bread, for the first two years" at certain set prices. The Buyer further agrees to purchase from the Seller the pizza shells and the garlic bread for the first two years [and that] [t]he Buyer further agrees to maintain the Restaurant in optimum condition, maintain the uniforms dictated by Seller and **agrees to bi-yearly inspections by Manuel Montes de Oca, Jr., or his successor**.

[ECF No. 61, ¶ 3] (alterations and emphasis in Statement of Facts).

---

2010 annual report, and the 2011 annual report, which list only Alexis Mederos and make no mention of Peña. *Id.* Plaintiffs also cite Alexis Mederos' deposition testimony where he testified that Peña was an acquaintance, that they were not partners, and that he did not enter into any contracts with Peña.

The Undersigned finds that for purposes of the instant motion, there is a genuine issue of material fact as to whether Peña controlled the operation of the restaurant associated with Batabano I before 2012. Plaintiffs have not presented any evidence to dispute Peña's control or operation of the restaurants associated with Batabano II and III.

4.      N/A[4]

5.      N/A[5]

6.      On July 1, 2009, an Assignment and Assumption of Lease was executed by and between Essex Shopping Center, LLC, as Landlord, Montes de Oca Original Pizza Cubana Hialeah, Inc., as assignor, and Batabano Group, Inc. d/b/a Montes de Oca Original Pizza Cubana (a/k/a. Batabano I), as assignee, for the lease governing the property at 455 Hialeah Drive, Hialeah, Florida 33010, in connection with the 2009

---

[4]      Plaintiffs dispute paragraph 4, which states that "[a]t all relevant times, Defendant Luis Peña was [Alexis] Mederos' business partner. [Alexis] Mederos performed the aforementioned transaction at the direction and for the benefit of Mr. Peña." [ECF No. 61, ¶ 4; 69, ¶ 4]. The deposition testimony of Alexis Mederos (denying he had a business relationship with Peña, stating that they were not partners, and contending that Peña was an acquaintance) creates a factual dispute as to whether Alexis Mederos was Peña's business partner and whether Alexis Mederos entered into the 2009 transaction on behalf of Peña.

[5]      In paragraph 5, Peña seeks to establish that "[a]t all relevant times, [he] conducted himself as an officer of the corporation and had full authority to make decisions and conduct business on behalf of the corporation." [ECF No. 61, ¶ 5]. Plaintiffs dispute this fact. [ECF No. 69, ¶ 5]. They assert that "[t]he relevant time period for Defendant Peña starts after 2011" and note that "Defendant Peña was not an officer, director, shareholder, or registered agent for Batabano I before 2012." *Id.*

For the reasons already discussed, there is a material factual dispute over whether Peña "[a]t all relevant times . . . conducted himself as an officer of the corporation and had full authority to make decisions and conduct business on behalf of the corporation." [ECF No. 61, ¶ 5]. For instance, there is no mention of Peña in Batabano I's corporate filings before 2012 and Alexis Mederos (who incorporated Batabano I) denied having a business relationship with Peña.

Agreement.[6]

7.     The Assignment and Assumption of Lease was executed by Senior and Gonzalez, on behalf of Montes de Oca Original Pizza Cubana Hialeah, Inc., in their capacities as President and Vice-President of the Company, respectively. Alexis Mederos signed the Assignment and Assumption of Lease in his capacity as President of Batabano I.[7]

8.     On October 11, 2011, Manuel Montes de Oca, Jr. ("Junior"), as seller, entered into an As Is Purchase and Sale Agreement ("2011 Agreement") with Batabano Group II, Inc., as buyer, whereby Batabano Group II, Inc., purchased the restaurant known as "Montes de Oca Original Pizza Cubana #3, Inc." located at 1740 Palm Ave., Hialeah, Florida 33010. The 2011 Agreement provided, in part, that:

> [s]o long as the existing lease is in effect, [Batabano II] shall use the name Montes de Oca Pizza Cubana for the restaurant. The Buyer further agrees to purchase from the Seller the pizza shells and the garlic bread for the first two years [and that] [t]he Buyer further agrees to maintain the Restaurant in optimum condition, maintain the uniforms dictated by Seller and **agrees**

---

[6]     Plaintiffs dispute the sentence in paragraph 6, which states that "[Alexis] Mederos performed the aforementioned transaction at the direction and for the benefit of Mr. Peña." [ECF Nos. 61, ¶ 6; 69, ¶ 6]. For the reasons already discussed, whether Mederos acted on behalf of Peña is a disputed fact.

[7]     Peña seeks to include the following fact: "Alexis Mederos was neither a signatory to nor mentioned by name in the Assignment and Assumption of Lease." [ECF No. 61, ¶ 7]. However, the Assignment and Assumption of Lease filed by Defendants shows that Alexis Mederos signed the document in his capacity as President of Batabano I. [ECF No. 61-5, p. 5]. Therefore, the Undersigned has modified paragraph 6 to reflect that Alexis Mederos signed this document in his capacity as President of Batabano I.

**to bi-yearly inspections by Manuel Montes de Oca, Jr., or his successor**.

[ECF No. 61, ¶ 8 (alterations and emphasis in Statement of Facts)].[8]

9.      N/A[9]

10.     On September 6, 2018, Junior, as seller, entered into a Purchase Agreement

("2018 Agreement") whereby Peña and Yamilin Mederos purchased the restaurant

known as Montes de Oca Pizza Cubana Restaurant/Pizzeria located at 4360 NW 7th St.,

Miami, Florida 33126. *See* [ECF No. 61-7]. The 2018 Agreement provides in relevant part

that the seller "owns several Pizza Restaurants known as 'Montes de Oca Pizza Cubana'

and the trademark 'Montes de Oca Pizza Cubana' (hereinafter referred to as 'MDO') and

---

[8]      Plaintiffs dispute this fact because the 2011 Agreement is unsigned and Alexis Mederos testified during his deposition that he did not recognize the document. [ECF No. 69, ¶ 8]. However, Peña attests in his affidavit that the 2011 Agreement "is a true and accurate copy of the As Is Purchase and Sale Agreement as signed and implemented by the parties." [ECF No. 61-4, ¶ 8].

"[R]ecord material "need not be authenticated to be considered [on summary judgment] — instead, it need only be capable of authentication." *Am. Gen. Life Ins. Co. v. Parker*, No. 8:20-CV-2666-SDM-AAS, 2021 WL 6774348, at *2 (M.D. Fla. Dec. 20, 2021), appeal dismissed, No. 22-10264-G, 2022 WL 1321818 (11th Cir. Mar. 11, 2022) (quoting *Smith v. Marcus & Millich, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021)). For the reasons discussed in the Order denying Plaintiffs' motion *in limine*, Defendants should be provided with an opportunity to authenticate the document at trial. [ECF No. 105, pp. 8-15].

Nonetheless, the portion of paragraph 8 which states that Junior was "acting on behalf of Senior" is disputed and has been omitted from paragraph 8 above.

[9]      The parties dispute when Plaintiffs objected to Batabano I or Batabano II's use of the Marks.

has several licensing agreements with individual restaurants to use the trademark and to

provide them products pursuant to their agreements . . . ." [ECF No. 61-7, p. 1]. The 2018

Agreement also provides that

> Buyers have the right to use and operate the Business under the Montes de
> Oca Trademark indefinitely and pursuant to the terms of the Licensing
> Agreement executed by the parties on or about May 3, 2018, and which is
> extended to include the location of the Business location purchased herein.
> Buyer will have the right to use the MDO name indefinitely in this location
> and in two additional locations Buyers wish to open in the future, without
> any further money being due and owing[.]

*Id.* at 4.[10]

11.     At the time of this transaction, Peña was President and Yamilin Mederos

was Vice-President of Batabano III.

12.     On September 6, 2018, Gonzalez, President of Monte Pizza, Inc., personally

handed Peña the keys to the office of the restaurant.

13.     Batabano III now operates under the name "Nikki's Pizza."[11]

---

[10]     Plaintiffs do not dispute that Junior signed the 2018 Agreement. [ECF No. 69, ¶
10]. Rather, they argue that the agreement did not confer any valid trademark rights. *Id.*
The Undersigned finds the facts, as stated in paragraph 10, to be undisputed. Whether
the 2018 Agreement confers any rights to use the Marks or supports Peña's argument that
Batabano II and III had apparent authority to use the Marks are questions of law.

[11]     The second half of paragraph 13 states that "[Batabano III] no longer uses the
subject marks." [ECF No. 61, ¶ 13]. Peña does not provide a specific date for when
Batabano III stopped using the Marks. Plaintiffs dispute this fact and have filed a
photograph from November 5, 2021 and UberEats screenshots taken in November and
December of 2021 and January 2022 showing the use of the MONTES DE OCA name for
the restaurant located at 4360 NW 7 Street, Miami, Florida. [ECF Nos. 69-5; 69-7]. The

**Additional Facts**[12]

14.    The 2009 Agreement was executed between Gonzalez, Senior, and Alexis Mederos.

15.    The 2009 Agreement does not name Batabano I or Peña as contracting parties.[13]

16.    Peña was not present for the execution of the 2009 Agreement.

17.    The 2009 Agreement includes a clause stating that "the parties cannot assign this Agreement or any of their rights under this Agreement except by operation of law to their personal representatives in the event of their death, incapacity, or dissolution . . . ." [ECF No. 61-3, § 9].[14]

---

Undersigned finds that the second part of paragraph 13 is disputed for purposes of the instant motion.

[12]    Plaintiffs' additional facts consist of 31 numbered paragraphs. [ECF No. 69]. Peña's reply to the additional facts consists of 36 numbered paragraphs. [ECF No. 82]. Peña's responses through paragraph 31 appear to line up with the subject matter in Plaintiffs' numbered paragraphs. Therefore, it appears that Peña's numbered paragraphs 32 through 36 were included in error.

[13]    Peña seeks to add that "Alexis Mederos was . . . acting at the direction of, and in his capacity as business partner to . . . Peña." [ECF No. 82, ¶ 15]. As already noted, whether Alexis Mederos was acting on behalf of Peña or was Peña's business partner is a disputed fact.

[14]    Peña does not dispute that the 2009 Agreement contains this language. [ECF No. 82, ¶ 17]. Instead, he argues that the provision was waived. Whether a contractual provision is waived is a legal conclusion, not a fact. Moreover, Peña has not presented any legal argument or case law on the issue of waiver and the Undersigned will not do

18.     During his deposition, in response to a question about the nature of his business relationship with Peña, Alexis Mederos stated, "Nothing. I leave clear the fact that we are acquaintances. We are not partners . . . . I don't have a partner." [ECF No. 69-1, 13:9-14].

19.     During his deposition, Alexis Mederos denied ever conducting any business with Peña, entering into any contracts with Peña, or transferring any restaurants to Peña.[15] [ECF No. 69-1, 30:5-15].

20.     N/A[16]

21.     For several years, beginning in 2013, Peña made payments to Senior for food products.

22.     In early 2017, Peña and his companies stopped purchasing food products

---

Peña's research for him. *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001). The facts asserted in Paragraph 18 are deemed undisputed.

[15]     Peña attempts to dispute paragraph 19 because "[a]t all relevant times, Defendant Luis Peña was [Alexis] Mederos' business partner." Paragraph 19 concerns what Alexis Mederos testified to during his deposition. Peña does not contend that Alexis Mederos' deposition transcript contains errors or that Alexis Mederos' testimony was taken out of context. The Undersigned therefore finds that what Alexis Mederos testified to during his deposition is undisputed. This finding is separate and apart from the question of whether Alexis Mederos' deposition testimony was truthful.

Nonetheless, the Undersigned has rephrased paragraph 19 because Plaintiffs have failed to attach one of the cited pages. Plaintiffs cite to pages 29 and 30 of Alexis Mederos' deposition, but have not filed page 29. Therefore, the Undersigned has revised paragraph 19 so that it includes only the testimony appearing on page 30 of the deposition transcript.

[16]     Peña disputes having received an oral license in 2013 from Senior.

from Senior.

23.     Defendants continued to use the Marks despite no longer purchasing products from Senior.[17]

24.     The 2009 Assignment and Assumption of Lease does not mention nor confer any rights relating to MONTES DE OCA marks.[18]

25.     Defendants admitted that Peña is, and has been, since 2013, the sole shareholder, officer, director, and registered agent for Batabano I and Batabano II and a majority shareholder, director, and president of Batabano III.

26.     During his deposition taken in *Montes de Oca Jr. v. Las Originales Pizza, Inc.*, Case No. 2018-041326-CA-01 in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida ("Florida Litigation"), Peña testified that he did "everything" at the pizzeria. [ECF No. 69-8, p. 5:20-24]. When asked to elaborate, he stated that he did "[e]verything that an owner does" and cited cleaning tables and making the dough. *Id.* at

---

[17]     Peña disputes the first portion of Plaintiffs' paragraph 23 -- "[d]espite protests from [Senior] and Gonzalez in 2017" -- and cites to his affidavit, where he attests that "[a]t no time prior to September 6, 2018, did anyone on behalf of the Plaintiffs object to use of the Marks by Batabano I or II." [ECF No. 61-4, ¶ 10]. Based on Peña's affidavit, whether anyone on behalf of Plaintiffs protested the use of the Marks in 2017 is a disputed fact. This fact has therefore been omitted from paragraph 23.

[18]     Peña disputes paragraph 24 on the ground that the right to use the Marks was conferred in the 2009 Agreement, not the *lease* agreement. However, the statement contained in paragraph 24 is factually true. The lease agreement does not mention or assign any rights related to the Marks. Paragraph 24 is deemed admitted.

6:1-7.[19]

27.     Peña helped financed Junior's state litigation (the Florida Litigation), regarding the issue of ownership of the Marks.

28.     N/A[20]

29.     N/A[21]

---

[19]     Peña disputes paragraph 26 because it paraphrases his testimony. [ECF No. 82, ¶ 26]. The Undersigned has reworded paragraph 26 to reflect Peña's testimony on the pages cited by Plaintiffs.

[20]     Plaintiffs seek to add the additional fact that "Peña has used his Batabano corporations as his alter ego." [ECF No. 69, ¶ 28]. In support of this fact, Plaintiffs state that "Pena appeared in checks as joint account owner in one of the accounts for Batabano II (administratively dissolved on September 25, 2020)." *Id.* The checks filed by Plaintiffs have the name(s) of the accountholders partially covered by a stamp. [ECF No. 69-10].

Peña disputes this fact and cites, generally, to the report of Defendants' expert, forensic accountant Daniel J. Gallogly ("Gallogly"). Gallogly reviewed some records concerning Batabano I and, to the Undersigned's knowledge, issued no opinions on the alter ego issue with respect to any of the corporate defendants.

Nonetheless, the Undersigned deems this fact disputed. Not because Peña has adequately responded to this fact, but because the record evidence cited by Plaintiffs (photocopies of two checks with the name of the accountholders partially blocked by a stamp) is insufficient to support this fact.

[21]     In paragraph 29, Plaintiffs state that "Defendant Peña[ ] commingled the funds of the Batabano corporations with his own, for his personal benefit." [ECF No. 69, ¶ 29]. Plaintiffs cite to "check amounts and transactions for Mr. Peña's Porsche and Mercedes vehicles, his credit cards, jewelry, Victoria Secret, Macy's, his condominium, and checks made out to cash." *Id.*

Peña responds to paragraph 29 by invoking the findings and opinions of Gallogly,

30.     When Gonzalez provided Peña with the keys to the office of the restaurant located at 4360 NW 7th St., Miami, Florida 33126, she was not aware that Junior had sold Senior's bakery (production facility) to Peña nor granted a perpetual license to Peña.[22]

31.     N/A[23]

## III.   Applicable Legal Standard

On a motion for summary judgment, the Court must construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment can be entered on a claim only if it is shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition, under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary judgment

---

contesting the "unauthenticated spreadsheet[]" included in Plaintiffs' filing [ECF No. 69, p. 6], and citing unspecified responses to requests for production.

While Peña has not adequately responded to paragraph 29, the Undersigned cannot deem this fact undisputed based on a limited number of checks, some of which appear, at first glance, to be unrelated to business expenses.

[22]    Plaintiffs seek to add that Gonzalez did not consent or encourage Peña to use the Marks when she gave him the keys and that the sale of the restaurant is not the same as the sale (or licensing) of a trademark. These are not facts; these are legal arguments concerning the significance of the parties' actions or the relevance of certain evidence. The Undersigned will therefore omit these "facts" from the summary of undisputed *facts*.

[23]    In Paragraph 31, Plaintiffs seek to add that due to various factors, confusion is inevitable. This is not a fact. It is a legal argument. Consequently, paragraph 31 has been omitted from the summary of undisputed facts.

for the nonmoving party "[a]fter giving notice and a reasonable time to respond." *See*

*Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1261 (11th Cir. 2011).

> The Supreme Court has explained the summary judgment standard as follows:
>
> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).

The Court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Id.* at 248; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *see also* Fed. R. Civ. P. 56(c). To meet this burden, the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.*

## IV.   Analysis

Peña seeks summary judgment on all claims asserted against him. [ECF No. 60]. He argues that he cannot be held liable in his capacity as an officer of the Batabano defendants because the Batabano defendants, at all relevant times, lawfully used the Marks. He further argues that he cannot be held *personally* liable because, at all relevant times, he acted in his capacity as an officer of the corporate defendants. The Undersigned will address Peña's arguments in turn.

### i.     Alleged Authorized Use of the Marks

Peña argues that he is entitled to summary judgment because at all relevant times the corporate defendants (Batabano I, Batabano II, and Batabano III) were authorized to

use the Marks. [ECF No. 60, pp. 3-8]. According to Peña, "use of the subject Marks was either through the express authority of Senior, as pertains to Batabano I, or the apparent authority of Junior coupled with Plaintiffs' acquiescence as pertains to Batabano II and Batabano III." [ECF No. 81, p. 1].

As discussed below, Peña has not met his initial burden of showing that any of the Batabano defendants were authorized to use the Marks, *as a matter of law*.

## 1. Batabano I

Peña argues that Batabano I used the Marks pursuant to a license. [ECF No. 60, p. 4]. "A trademark license is a grant of permission to use the grantor's trademark." *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 920–21 (C.D. Ill. 2000) (citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 18:42–18:43 (4th ed.)). According to Peña, "Batabano I obtained a license to use the [M]arks directly from Senior, evident from the express language of the [2009] [A]greement and subsequent assignment and assumption of lease." [ECF No. 60, p. 4].

Plaintiffs dispute that the 2009 Agreement and/or the July 1, 2009 Assignment and Assumption of Lease conferred a license on Batabano I. Instead, Plaintiffs contend that the parties had an *oral* license.

According to Plaintiffs, beginning in 2013, Batabano I had an oral license to use the Marks, contingent on Batabano I purchasing food products from Senior. [ECF No. 68, p. 1]. According to Plaintiffs, this oral license was "terminated in 2017 when Batabano I and

16

Luis Peña ceased purchasing products from [Senior]." Plaintiffs thus argue that Defendants' continued use of the Marks after the termination of the oral license "constitutes . . . trademark, service mark[,] and trade name infringement." *Id.*

Peña points to the *written* 2009 Agreement as evidence that use of the Marks was not contingent upon the purchase of food products from Senior. [ECF No. 81, p. 2]. To the extent Peña is attempting to refute the terms of an alleged *oral* license by citing to the terms of a *written* agreement, that argument is not well taken. Whatever contingencies were (or were not) in the *written* agreement do not control the terms of the alleged *oral* license claimed by Plaintiffs.

Peña further asserts that "to the extent purchases of food product ceased, this had no bearing on the right to use the subject marks" because "[t]he [2009] Agreement clearly distinguishes between the use of the subject [M]arks and the purchasing of the foods as being separate conditions." [ECF No. 81, pp. 1-2].

The 2009 Agreement states, in part, that:

> So long as the existing lease is in effect, the Buyer shall use the name "Montes de Oca Pizza Cubana" for the Restaurant. The Buyer further agrees to purchase from the Seller the pizza shells and the garlic bread, for the first two years at the following prices: Pizza Bambina Pizza Personal Pizza Familiar Garlic Bread Bag $0.50 each[,] $1.25 each[,] $2.25 each[,] $1.50 each[.] The Seller agrees to provide the aforementioned products for the life of the existing lease at a price not to exceed a 30% increase of the aforementioned prices, after the first two years.

*Id.* at 2 (citing 2009 Agreement).

Assuming, arguendo, that Peña's interpretation of the 2009 Agreement is correct -- that the use of the Marks is not contingent on the purchase of food products from Senior -- Peña still has not shown as a matter of law that *Batabano I* was authorized to use the Marks.

As Plaintiffs point out, Batabano I and Peña were not named in the 2009 Agreement:

> Plaintiffs do not dispute that [Senior] and . . . Gonzalez executed the 2009 . . . Agreement with Alexis Mederos for the purchase of [the] 455 Hialeah Drive restaurant and it allowed [Alexis] Mederos to use the Marks subject to the terms of their agreement. However, Plaintiffs dispute [that] Batabano I and Luis Peña were parties to this agreement.

[ECF No. 68, p. 2]. Plaintiffs note that Batabano I and Peña are not mentioned in the agreement and that "the 2009 articles of incorporation and 2010 annual report for Batabano I list only Alexis Mederos as an officer and do not include mention of Luis Peña." *Id.* at 3.

Plaintiffs also argue that "the parole [sic] evidence rule has not (and cannot) been invoked to inject the interpretation alleged by Peña." *Id.* However, neither party has substantively addressed the parol evidence rule. "As the parties have not briefed the issue, the Court will not address it at this time." *Isler v. Adelusola*, No. 08-60257-CIV, 2008 WL 11409458, at *14 (S.D. Fla. Sept. 29, 2008); *Phillips*, 244 F.3d at 800 n.10 ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority,

forfeits the point. The court will not do his research for him." (internal quotations omitted)).

Peña acknowledges Plaintiffs' "dispute that Mr. Peña was not involved in the transaction for the Batabano I property" but nonetheless insists that "the undisputed evidence provides that at all relevant times Mr. Peña was [Alexis] Medero's [sic] business partner", "that the transaction was performed at [sic] Mr. Peña's benefit" and that "Peña at all relevant times conducted himself as an officer of Batabano I" with "full[] authority to make decision[s] and conduct business[s] on behalf of Batabano I." [ECF No. 81, pp. 3-4 (record citations omitted)].

Peña does not address Alexis Mederos' own deposition testimony disclaiming a business relationship with Peña, [ECF No. 69-1, 13:9-14, 30:5-15], or Batabano I's corporate filings with the Florida Department of State, which make no mention of Peña before 2012. Whether Alexis Mederos acted on Peña's behalf and Peña's pre-2012 role vis-à-vis Batabano I are clearly disputed facts in this case.

Peña also does not address (with supporting legal authority) how the 2009 Agreement (which makes no mention of Batabano I) conferred rights to Batabano I or, alternatively, how Alexis Mederos transferred any rights to Batabano I. Although Peña also mentions the 2009 lease agreement, he does not engage in any legal analysis (with supporting authority) concerning how the 2009 Agreement coupled with the 2009 lease conferred rights to use the Marks to Batabano I. The Undersigned is not making any legal

determinations, but, instead, is merely pointing out gaps in Peña's authorized use argument.

In any event, based on this record, Peña has not shown (as a matter of law) that Batabano I was authorized to use the Marks.

### 2. Batabano II and Batabano III

Next, Peña argues that Batabano II was authorized to use the Marks because of an agreement with Junior:

> The purchase and sale agreement governing the Batabano II transaction clearly provides that Junior "is the owner of the restaurant known as Montes de Oca Original Pizza Cubana #3, Inc.", provides express authority to use the "Montes de Oca Pizza Cubana" trademark for the restaurant; and requires the Buyer to purchase pizza, shells and garlic breads from Junior for two years, and subject itself [sic] to bi-yearly inspections by Junior himself, or Junior's successor. From 2011 to September 2018, no one asserted Junior had acted without authority in the Batabano [II] transaction. Mr. Peña, in light of apparent authority exhibited by Junior, had a good faith belief the transaction was valid.

[ECF No. 60, p. 4].

Peña raises a similar argument with respect to Batabano III:

> the purchase agreement governing the Batabano III location expressly provides that Junior owns several pizza restaurants known as 'Montes de Oca Pizza Cubana and the trademark 'Montes de Oca Pizza Cubana', and has several licensing agreements with individual restaurants to use the trademark and to provide them products pursuant to their agreements. Based on the history of dealings, including two virtually identical prior transactions and the ongoing purchase of Montes de Oca products, Mr. Peña, again, had a good faith belief in the validity of this transaction.

[ECF No. 60, p. 5].

"Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996) (citing *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991)). It "requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Id.*

Plaintiffs argue that Peña "has not sufficiently plead[ed] nor established the affirmative defense of acquiescence" and "object to extending this litigation beyond the pleadings filed." [ECF No. 68, p. 4].

Peña counters that "Plaintiffs' argument that [he] waived the defense of acquiescence is meritless" because the "conduct [supporting the acquiescence defense] was clearly covered by" Defendants' Seventh and Eight affirmative defenses. [ECF No. 81, p. 4 (citing Answer [ECF No. 38, ¶¶ 96-97]].

The Eleventh Circuit has stated that:

> If a party fails to raise an affirmative defense in the pleadings, the party ordinarily waives its right to raise the issue at trial. Nevertheless, the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses. We must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule. **When a plaintiff has notice that an affirmative defense will be raised at trial, the failure of the defendant to plead the affirmative defense does not prejudice the plaintiff, and it is not error for the district court to hear evidence on the issue**.

*Hewitt v. Mobile Rsch. Tech., Inc.*, 285 F. App'x 694, 696 (11th Cir. 2008) (internal citations and quotation marks omitted) (emphasis added).

For purposes of the instant Report and Recommendations only, the Undersigned finds that Plaintiffs were reasonably on notice of Defendants' intent to rely on acquiescence as an affirmative defense. In any event, there is no harm to Plaintiffs in the Undersigned considering Peña's acquiescence argument for purposes of this Report and Recommendations because, as discussed below, it is not outcome-determinative (i.e., Peña is not entitled to summary judgment on this issue).

Plaintiffs also note that "the defense of acquiescence is not absolute" and "a strong showing of a likelihood of confusion trumps even a proven case of acquiescence by the senior user to the junior user's usage[.]" [ECF No. 68 at 5].

As the Eleventh Circuit has noted, "the defense of acquiescence is not absolute" and "[u]pon a showing that 'inevitable confusion' arises from the continued dual use of the marks, a senior user's claim may be revived from estoppel." *SunAmerica Corp.*, 77 F.3d at 1334 (footnote omitted). In *SunAmerica Corp.*, the Eleventh Circuit stated that:

> Due to the fact-intensive nature of the inquiry, "inevitable confusion" does not lend itself to a formulaic, mechanical definition. For present purposes, it is sufficient to note that "the standard of confusion required for a finding of inevitability of confusion is an increment higher than that required for a finding of a likelihood of confusion."

*Id.* at n.3 (quoting *Coach House Restaurant*, 934 F.2d at 1564).

Here, Plaintiffs have not established inevitable confusion at this juncture in the case. *See, e.g.*, *Nat'l Baseball Hall of Fame & Museum, Inc. v. All Sports Promotions Grp., Inc.*, No. 99-CIV-3635 (KMW), 2001 WL 196755, at *11, n.6 (S.D.N.Y. Feb. 20, 2001) ("[The] [p]laintiff also argues that the defense of acquiescence is barred as a matter of law by the doctrine of inevitable confusion. As explained above, the Court is not able to conclude as a matter of law that defendants' use of the [subject] term . . . created **a strong likelihood** of actual confusion. Therefore, a fortiori, the Court cannot conclude as a matter of law that the use of the term created **inevitable** confusion." (emphasis added)).

"One way to show acquiescence is by showing the plaintiff knew about the infringement and did not act." *Speed Rmg Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-CV-609 (NEB/LIB), 2022 WL 1090605, at *15 (D. Minn. Apr. 11, 2022).[24] Peña notes that Plaintiffs (or their predecessors in interest) "had actual knowledge" of the Batabano entities' use of the Marks because of: (1) Plaintiffs' sale of food products to the Batabano entities and (2) Plaintiffs' designation of "Junior [to] conduct periodic inspections for compliance with quality standards." [ECF No. 60, pp. 7-8].

Peña further claims that "Plaintiffs acquiesced in the transaction of the Batabano III restaurant" based on Gonzalez's conduct. He notes that Gonzalez "admit[ted] she had actual knowledge that Junior had sold the Northwest 7th Street location to Batabano III

---

[24]     In the instant case, neither party has addressed (through legal authority) the length of a delay which would be considered unreasonable or inexcusable.

at the time of the sale, and before the transaction was consummated" but "[r]ather than

communicate any objection to Mr. Peña, or seeking legal recourse to stop the sale, she

proceeded to acquiesce in Junior's request that she move her personal belongings from

the office and personally delivered the keys to Mr. Peña." [ECF No. 60, p. 5].

Peña also cites Plaintiffs' alleged delay in objecting to the use of the Marks by the

Batabano entities:

> Neither Plaintiff[s] nor any of Plaintiffs' predecessors in interest objected to
> the aforementioned transactions, although they had full knowledge of the
> transactions. The delay exhibited by Plaintiffs in seeking to enforce their
> marks against Mr. Peña in his capacity as an officer of the Batabano
> Defendants severely prejudice[d] Mr. Peña in that he understood his use of
> the marks to be pursuant to lawful transactions and consent of the Plaintiffs
> and their representatives and/or Junior.

[ECF No. 60, p. 5].

Plaintiffs argue that Peña is not entitled to summary judgment based on

acquiescence because Peña:

> has failed to provide any evidence of irrevocable consent and the infringing
> activity began in 2017. In May 2018, [Peña] entered into an improper
> licensing agreement for the Marks with [Junior] who did not own the
> Marks nor was authorized by [Senior]. *See* ECF No. 57 at ¶47-49. Defendant
> admits to receiving a cease-and-desist letter from Plaintiffs in December
> 2018. *See* Defendants' Answer (ECF No. 38) to Amended Complaint (ECF
> No. 32-1) ¶38-39 and Exhibit 11, attached to the Amended Complaint. And
> this case was filed on June 20, 2019. There is no evidence to support [Peña]'s
> contention that a mere two-year delay (at most) by Plaintiffs or their
> predecessor in interest is unreasonable or inexcusable.

[ECF No. 68, p. 5].

Based on the disputed record, Peña has not shown that Batabano II's use of the Mark was authorized or based on Plaintiffs' acquiescence, *as a matter of law*. *See, e.g., Speed Rmg Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-CV-609 (NEB/LIB), 2022 WL 1090605, at *15 (D. Minn. Apr. 11, 2022) ("Because the evidence show[ed] that [trademark owner] repeatedly objected to [alleged infringer]'s use of its marks while allowing other uses, the Court cannot grant summary judgment to [alleged infringer] on its defense of acquiescence."); *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 501 (W.D. Pa. 2011) (denying partial summary judgment motion where issue of acquiescence was "hotly contested issue between the parties involving disputed material facts and issues of intent, none of which [were] clearly determinable on the record").

For the reasons discussed above, the Court should not grant summary judgment to Peña on the issue of the Batabano entities' alleged lawful use of the Marks.

### ii.      Corporate Officer's Personal Liability for Trademark Infringement

Next, Peña argues that he cannot be held personally liable because, at all times, he was acting in his corporate capacity as an officer of the Batabano defendants. [ECF No. 60, pp. 8-10]. This argument does not comport with Eleventh Circuit precedent.

Peña focuses on the allegations in the Amended Complaint [ECF No. 37] and states that "[t]here are no allegations that any acts or omissions committed by Mr. Peña regarding trademark infringement and the related causes of action **occurred in Mr. Peña's individual capacity**." [ECF No. 60, p. 9 (emphasis added)]; *see also* [ECF No. 81,

pp. 1-2 ("[A]ny acts or omissions allegedly committed by Mr. Peña were in his capacity as an officer for the Batabano Defendants and Plaintiffs have set forth no evidence supporting the notion that the Batabano Defendants were Mr. Peña's 'alter ego[,] used for ulterior purposes.'")].

However, in the Eleventh Circuit, "[n]atural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act. Because of its very nature a corporation can act only through individuals. . . . If an individual actively and knowingly caused the infringement, he is personally liable." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (internal citations omitted). Thus, "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994).

In other words, "[i]ndividual liability for trademark infringement does not turn on corporate form. Rather, it turns on the principle that '[i]f an individual actively and knowingly caused the trademark infringement, he is personally responsible.'" *ADT LLC v. Alarm Prot. Tech. Fla., LLC*, 646 F. App'x 781, 788 (11th Cir. 2016) (quoting *Babbit Elecs., Inc.*, 38 F.3d at 1184).

Peña cites to *Metro Worldwide, LLC v. ZYP, LLC*[25] as an example of a case where "the individual defendants were granted summary judgment because the undisputed facts showed that they, at all relevant times, were acting in their capacities as members of an LLC, *not* in their individual capacities." [ECF No. 60, p. 9 (emphasis in original)]. However, *Metro Worldwide, LLC* is distinguishable from the instant case because it did not concern claims of trademark infringement.

Peña acknowledges the Eleventh Circuit's decision in *Chanel, Inc.* [ECF No. 60, pp. 9-10]. Nonetheless, Peña contends he is still entitled to summary judgment on this issue because:

> the record is devoid of any evidence, and Plaintiffs have not alleged, that Mr. Peña in his individual capacity *knowingly* caused any trademark infringement. Indeed, the record evidence shows to the contrary – that Mr. Peña, through the Batabano entities, at all relevant times were [sic] using the subject Marks pursuant to contractual agreements that are facially valid and to which . . . Plaintiffs and their predecessors in interest never timely objected. The record evidence shows the use of the subject Marks was either through the express authority of Senior, as pertains to Batabano I, or the apparent authority of Junior coupled with Plaintiffs' acquiescence as pertains to Batabano II and Batabano III. It is undisputed that Mr. Peña, in his capacity as officer of the Batabano Defendants, had, at all relevant times, a good faith belief that the Batabano Defendants were authorized to use the subject Marks.

---

[25] No. 19-CV-81502-RLR, 2021 WL 1053389, at *1 (S.D. Fla. Jan. 22, 2021), report and recommendation adopted in part, rejected in part, No. 9:19-CV-81502-RLR, 2021 WL 1015960 (S.D. Fla. Mar. 17, 2021).

Although not noted in Peña's Motion [ECF No. 60, p. 9], the District Court in *Metro Worldwide, LLC* declined to adopt a portion of the report and recommendations. *Id.* The Undersigned reminds the parties of their duty of candor when citing cases.

*Id.* at 10 (emphasis in original).

Plaintiffs argue "Peña's active involvement in the infringing activity should be considered undisputed" given that Peña "admitted that he was the sole shareholder, officer, and director of Batabano I and II and is a majority shareholder, director, and president of Batabano III." [ECF No. 68, p. 6]. Plaintiffs also argue that "though it is not necessary for the purposes of establishing personal liability for infringement under the Lanham Act, there is also sufficient evidence that [Peña]'s Batabano corporations are simply his alter egos." *Id.* at 7.

Peña argues that "Plaintiff[s] should not be allowed to cure [their] negligence in failing to plead individual allegations against Mr. Peña at this stage of the proceedings." [ECF No. 81, p. 5]. Peña objects to Plaintiffs raising a new alter ego theory by asserting that "Peña commingled [corporate] funds for his own personal benefit." *Id.* at 5. Peña insists that "Plaintiffs have set forth zero evidence that Mr. Peña failed to follow corporate formalities; commingled corporate and personal affairs or engaged in inadequate capitalization." *Id.* at 6; *see also id.* at 2 (referring to Plaintiffs' proffered evidence as "unsupported conspiracy theories, non-expert opinions and sweeping generalizations").

Plaintiffs do not need to shore up any allegations in their Amended Complaint or rely on an alter ego theory. Under Eleventh Circuit case law, "a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing

activity, is personally liable for such infringement **without regard to piercing of the corporate veil**." *Babbit Elecs., Inc.*, 38 F.3d at 1184 (emphasis added).

Peña was an officer of the corporate defendants and executed certain purchase agreements in his capacity as an officer, including agreements which purportedly authorized use of the Marks. By his own admission, Peña did "everything" at the restaurant. [ECF No. 69-8, p. 5:20-24]. Meaning, he did "[e]verything that an owner does," including cleaning tables and making the dough. *Id.* at 6:1-7.

In *Bentley Motors Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1316 (M.D. Fla. 2013), for instance, the Court entered summary judgment against the individual defendant who was president and chief executive officer of the corporate defendant, actively advertised infringing car kits, and performed some of the paint and body work for several of the infringing car kits.

Given Peña's controlling role over the corporate defendants, a reasonable jury could conclude, based on the record in the instant case, that Peña "actively caused the infringement as a moving, conscious force." *Chanel, Inc.*, 931 F.2d at 1478. Peña is not entitled to summary judgment on the issue of personal liability.

## V.    Conclusion

Peña has not established as a matter of law that he is entitled to prevail on the issues of the Batabano entities' alleged lawful use of the Marks or on Peña's individual liability, at this stage of the case. The Undersigned therefore respectfully recommends

that the District Court **deny** Peña's motion for summary judgment.

## VI.    Objections

The parties will have fourteen (14) days from the date of being served with a copy

of this Report and Recommendations within which to file written objections, if any, with

United States District Judge Federico A. Moreno. Each party may file a response to the

other party's objection within fourteen (14) days of the objection. Failure to file objections

timely shall bar the parties from a *de novo* determination by the District Judge of an issue

covered in the Report and shall bar the parties from attacking on appeal unobjected-to

factual and legal conclusions contained in this Report except upon grounds of plain error

if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140,

149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on July 18,

2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Federico A. Moreno
All Counsel of Record